# THOMAS, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *v.* UNION CARBIDE AGRICULTURAL PRODUCTS CO. ET AL.

No. 84–497.  Argued March 26, 1985—Decided July 1, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 594. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 602.

*Deputy Solicitor General Wallace* argued the cause for appellant. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Flint, Jerrold J. Ganzfried, Anne S. Almy, Jacques B. Gelin, John A. Bryson,* and *Gerald H. Yamada.*

*Kenneth W. Weinstein* argued the cause for appellees. With him on the brief were *Lawrence S. Ebner* and *Stanley W. Landfair.**

---

*David B. Weinberg* and *William R. Weissman* filed a brief for Griffin Corp. et al. as *amici curiae* urging reversal.

*Wilkes C. Robinson* filed a brief for Gulf and Great Plains Legal Foundation as *amicus curiae* urging affirmance.

*Thomas H. Truitt, David R. Berz,* and *Jeffrey F. Liss* filed a brief for PPG Industries, Inc., as *amicus curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires the Court to revisit the data-consideration provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 61 Stat. 163, as amended, 7 U. S. C. § 136 *et seq.*, which was considered last Term in *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986 (1984). *Monsanto* examined whether FIFRA's data-consideration provision effects an uncompensated taking in violation of the Fifth Amendment. In this case we address whether Article III of the Constitution prohibits Congress from selecting binding arbitration with only limited judicial review as the mechanism for resolving disputes among participants in FIFRA's pesticide registration scheme. We conclude it does not and reverse the judgment below.

## I

The Court's opinion in *Monsanto* details the development of FIFRA from the licensing and labeling statute enacted in 1947 to the comprehensive regulatory statute of the present. This case, like *Monsanto*, concerns the most recent amendment to FIFRA, the Federal Pesticide Act of 1978, 92 Stat. 819 (1978 Act), which sought to correct problems created by the Federal Environmental Pesticide Control Act of 1972, 86 Stat. 973 (1972 Act), itself a major revision of prior law. See *Ruckelshaus* v. *Monsanto Co., supra*, at 991–992.

## A

As a precondition for registration of a pesticide, manufacturers must submit research data to the Environmental Protection Agency (EPA) concerning the product's health, safety, and environmental effects. The 1972 Act established data-sharing provisions intended to streamline pesticide registration procedures, increase competition, and avoid unnecessary duplication of data-generation costs. S. Rep. No. 92–838, pp. 72–73 (1972) (1972 S. Rep.). Some evidence suggests that before 1972 data submitted by one registrant

had "as a matter of practice but without statutory authority, been considered by the Administrator to support the registration of the same or a similar product by another registrant." *Ruckelshaus* v. *Monsanto Co., supra,* at 1009, n. 14. Such registrations were colloquially known as "me too" or "follow-on" registrations. Section 3(c)(1)(D) of the 1972 Act provided statutory authority for the use of previously submitted data as well as a scheme for sharing the costs of data generation.

> "In effect, the provision instituted a mandatory data-licensing scheme. The amount of compensation was to be negotiated by the parties, or, in the event negotiations failed, was to be determined by the EPA, subject to judicial review upon instigation of the original data submitter. The scope of the 1972 data-consideration provision, however, was limited, for any data designated as 'trade secrets or commercial or financial information' . . . could not be considered at all by EPA to support another registration unless the original submitter consented." *Ruckelshaus* v. *Monsanto Co., supra,* at 992–993.

Congress enacted the original data-compensation provision in 1972 because it believed "recognizing a limited proprietary interest" in data submitted to support pesticide registrations would provide an added incentive beyond statutory patent protection for research and development of new pesticides. H. R. Rep. No. 95–663, pp. 17–18 (1977); S. Rep. No. 95–334, pp. 7, 34–40 (1977) (1977 S. Rep.). The data submitters, however, contended that basic health, safety, and environmental data essential to registration of a competing pesticide qualified for protection as a trade secret. With EPA bogged down in cataloging data and the pesticide industry embroiled in litigation over what types of data could legitimately be designated "trade secrets," new pesticide registrations "ground to a virtual halt." *Id.,* at 3.

The 1978 amendments were a response to the "logjam of litigation that resulted from controversies over data compensation and trade secret protection." *Ibid.* Congress viewed data-sharing as essential to the registration scheme, *id.*, at 7, but concluded EPA must be relieved of the task of valuation because disputes regarding the compensation scheme had "for all practical purposes, tied up their registration process" and "[EPA] lacked the expertise necessary to establish the proper amount of compensation." 123 Cong. Rec. 25709 (1977) (statement of Sen. Leahy, floor manager of S. 1678). Legislators and the Agency agreed that "[d]etermining the amount and terms of such compensation are matters that do not require active government involvement [and] compensation payable should be determined to the fullest extent practicable, within the private sector." *Id.*, at 25710.

Against this background, Congress in 1978 amended § 3(c)(1)(D) and § 10(b) to clarify that the trade secret exemption from the data-consideration provision did not extend to health, safety, and environmental data. In addition, the 1978 amendments granted data submitters a 10-year period of exclusive use for data submitted after September 30, 1978, during which time the data may not be cited without the original submitter's permission. § 3(c)(1)(D)(i).

Regarding compensation for use of data not protected by the 10-year exclusive use provision, the amendment substituted for the EPA Administrator's determination of the appropriate compensation a system of negotiation and binding arbitration to resolve compensation disputes among registrants. Section 3(c)(1)(D)(ii) authorizes EPA to consider data already in its files in support of a new registration, permit, or new use, but "only if the applicant has made an offer to compensate the original data submitter." If the applicant and data submitter fail to agree, either may invoke binding arbitration. The arbitrator's decision is subject to judicial review only for "fraud, misrepresentation, or other

misconduct." *Ibid.*[1] The statute contains its own sanctions. Should an applicant or data submitter fail to comply with the scheme, the Administrator is required to cancel the

---

[1] The full text of § 3(c)(1)(D)(ii) reads:

"(ii) except as otherwise provided in subparagraph (D)(i) of this paragraph, with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for reregistration, the Administrator may, without the permission of the original data submitter consider any such item of data in support of an application by any other person (hereinafter in this chapter referred to as the 'applicant') within the fifteen year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such an agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant, have neither agreed on the amount and terms of compensation nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedures and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. The parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of

new registration or to consider the data without compensation to the original submitter. The Administrator may also issue orders regarding sale or use of existing pesticide stocks. *Ibid.*

The concept of retaining statutory compensation but substituting binding arbitration for valuation of data by EPA emerged as a compromise. This approach was developed by representatives of the major chemical manufacturers, who sought to retain the controversial compensation provision, in discussions with industry groups representing follow-on registrants, whose attempts to register pesticides had been roadblocked by litigation since 1972. Hearings on Extending and Amending FIFRA before the Subcommittee on Department Investigations, Oversight, and Research of the House Committee on Agriculture, 95th Cong., 1st Sess., 522–523 (1977) (testimony of Robert Alikonis, General Counsel to Pesticide Formulators Association).

B

Appellees are 13 large firms engaged in the development and marketing of chemicals used to manufacture pesticides.

---

the data in support of the application. Notwithstanding any other provision of this subchapter, if the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further hearing. Before the Administrator takes action under either of the preceding two sentences, the Administrator shall furnish to the affected person, by certified mail, notice of intent to take action and allow fifteen days from the date of delivery of the notice for the affected person to respond. If a registration is denied or canceled under this subparagraph, the Administrator may make such order as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Registration action by the Administrator shall not be delayed pending the fixing of compensation." 7 U. S. C. § 136a(c)(1)(D)(ii).

Each has in the past submitted data to EPA in support of registrations of various pesticides. When the 1978 amendments went into effect, these firms were engaged in litigation in the Southern District of New York challenging the constitutionality under Article I and the Fifth Amendment of the provisions authorizing data-sharing and disclosure of data to the public.[2] In response to this Court's decision in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982), appellees amended their complaint to allege that the statutory mechanism of binding arbitration for determining the amount of compensation due them violates Article III of the Constitution. Article III, § 1, provides that "[t]he judicial Power of the United States, shall be vested" in courts whose judges enjoy tenure "during good Behaviour" and compensation that "shall not be diminished during their Continuance in Office." Appellees allege Congress in FIFRA transgressed this limitation by allocating to arbitrators the functions of judicial officers and severely limiting review by an Article III court.

The District Court granted appellees' motion for summary judgment on their Article III claims. It found the issues ripe because the "statutory compulsion to seek relief through arbitration" raised a constitutionally sufficient case or contro-

---

[2] Following the 1978 amendments, appellees amended their complaints to allege that the data-consideration and disclosure provisions effected a taking of their property without just compensation and without due process of law. The District Court granted a preliminary injunction against use of data submitted prior to 1978, *Amchem Products, Inc.* v. *Costle*, 481 F. Supp. 195 (1979), but the Second Circuit reversed for want of a showing of likelihood of success and this Court denied appellees' petition for a writ of certiorari. *Union Carbide Agricultural Products Co.* v. *Costle*, 632 F. 2d 1014 (1980), cert. denied, 450 U. S. 996 (1981). Appellees then amended their complaint to allege that the lack of valuation standards rendered the arbitration provision an unconstitutional delegation of legislative authority in violation of Article I. At the same time they stipulated to dismissal, without prejudice to a Court of Claims action, of their due process claims. Record, Doc. Nos. 1, 15, 19.

versy. Although troubled by what appeared a "standardless delegation of powers," the District Court did not reach the Article I issue because it held that Article III barred FIFRA's "absolute assignment of [judicial] power" to arbitrators with only limited review by Article III judges. *Union Carbide Agricultural Products Co.* v. *Ruckelshaus,* 571 F. Supp. 117, 124 (1983). The District Court, rather than striking down the statutory limitation on judicial review, enjoined the entire FIFRA data use and compensation scheme. App. to Juris. Statement 25a.

Appellant took a direct appeal to this Court pursuant to 28 U. S. C. § 1252. We vacated the judgment of the District Court and remanded for reconsideration in light of our supervening decision in *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986 (1984). *Ruckelshaus* v. *Union Carbide Agricultural Products Co.,* 468 U. S. 1201 (1984). In *Monsanto,* we ruled that FIFRA's data-consideration provisions may be deemed a "public use" even though the most direct beneficiaries of the regulatory scheme will be the later applicants. 467 U. S., at 1014. Insofar as FIFRA authorizes the Administrator to consider trade secrets submitted during the period between 1972 and 1978, a period during which the registrant entertained a reasonable, investment-backed expectation that its trade secret data would be held confidential, we held it effects a taking. But the data originator must complete arbitration and, in the event of a shortfall, exhaust its Tucker Act remedies against the United States before it can be ascertained whether it has been deprived of just compensation. The Court distinguished between the "ability to vindicate [the] constitutional right to just compensation" and the "ability to vindicate [the] statutory right to obtain compensation from a subsequent applicant." *Id.,* at 1019. But we declined to reach Monsanto's Article III claim, explaining:

> "Monsanto did not allege or establish that it had been injured by actual arbitration under the statute. While the District Court acknowledged that Monsanto had re-

ceived several offers of compensation from applicants for registration, it did not find that EPA had considered Monsanto's data in considering another application. Further, Monsanto and any subsequent applicant may negotiate and reach agreement concerning an outstanding offer. If they do not reach agreement, then the controversy must go to arbitration. Only after EPA has considered data submitted by Monsanto in evaluating another application and an arbitrator has made an award will Monsanto's claims with respect to the constitutionality of the arbitration scheme become ripe." *Ibid.* (citation omitted).

On remand in this case, appellees amended their complaint to reflect that EPA had, in fact, considered their data in support of other registration applications. The amended complaint also alleged that data submitted by appellee Stauffer Chemical Company (Stauffer), originator of the chemicals butylate and EPTC, had been used in connection with registrations by PPG Industries, Inc. (PPG), and Drexel Chemical Company of pesticides containing butylate and EPTC as active ingredients. App. 23. The complaint further alleged Stauffer had invoked the arbitration provisions of § 3(c)(1)(D)(ii) against PPG, and appellees entered in evidence the award of the arbitration panel, handed down on June 28, 1983. *Id.*, at 42. Stauffer claimed the arbitrators' award fell far short of the compensation to which it was entitled.[3]

---

[3] Shortly after the award was handed down, PPG filed an action against Stauffer and EPA in the District Court for the District of Columbia to set aside the award. Stauffer cross-claimed against EPA seeking to have the entire FIFRA data-compensation scheme invalidated as violative of Article III and counterclaimed against PPG seeking damages in the amount of the award should the statute be struck down or, in the alternative, enforcement of the award. *PPG Industries, Inc.* v. *Stauffer Chemical Co.*, Civil Action No. 83–1941 (DC, filed July 7, 1983); Record, Doc. No. 35. Should the scheme be upheld, Stauffer argues it is entitled to the award as the only option possible under FIFRA absent fraud or misconduct.

In view of these developments, the District Court concluded that "[t]he claims presented by Stauffer challenging the constitutionality of FIFRA § 3(c)(1)(D) are ripe for resolution under the criteria established by the Supreme Court" in *Ruckelshaus* v. *Monsanto Co.*, *supra.* The remaining plaintiffs, the District Court held, were aggrieved by the clear threat of compulsion to resort to unconstitutional arbitration. App. to Juris. Statement 1a–4a. The District Court reinstated its prior judgment enjoining the operation of the data-consideration provisions as violative of Article III. EPA again took a direct appeal and we noted probable jurisdiction. 469 U. S. 1032 (1984). This Court stayed the judgment pending disposition of the appeal.

## II

As a threshold matter, we must determine whether appellees' Article III claims demonstrate sufficient ripeness to establish a concrete case or controversy. *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 138–139 (1974). Appellant contends that the District Court erred in addressing these claims because the criteria established in *Monsanto* for ripeness remained unsatisfied. Appellant argues that only one firm, Stauffer, engaged in arbitration and it seeks to enforce rather than challenge the award. Appellees counter that they are aggrieved by the *threat* of an unconstitutional arbitration procedure which assigns the valuation of their data to civil arbitrators and prohibits judicial review of the amount of compensation. Stauffer in particular argues that it was doubly injured by the arbitration. Although it claimed a shortfall of some $50 million, it was precluded by § 3(c)(1)(D)(ii) from seeking judicial review of the award against PPG. While seeking to enforce the award should its Article III claim fail, Stauffer has consistently challenged the validity of the entire FIFRA data-consideration scheme both here and in litigation initiated by PPG. See n. 3, *supra.*

We agree that Stauffer has an independent right to adjudication in a constitutionally proper forum. See *Glidden Co.*

v. *Zdanok*, 370 U. S. 530, 533 (1962). Although appellees contend and the District Court found that they were injured by the shortfall in the award, it is sufficient for purposes of a claim under Article III challenging a tribunal's jurisdiction that the claimant demonstrate it has been or inevitably will be subjected to an exercise of such unconstitutional jurisdiction. See *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S., at 56–57, aff'g 12 B. R. 946 (Minn. 1981) (reversing Bankruptcy Court's denial of pretrial motion to dismiss contract claim). "[A party] may object to proceeding further with [a] lawsuit on the grounds that if it is to be resolved by an agency of the United States, it may be resolved only by an agency which exercises '[t]he judicial power of the United States' described by Art. III of the Constitution." 458 U. S., at 89 (opinion concurring in judgment). In contrast to the Taking Clause claim in *Monsanto*, appellees' Article III injury is not a function of whether the tribunal awards reasonable compensation but of the tribunal's authority to adjudicate the dispute. *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co., supra; Glidden Co.* v. *Zdanok, supra.* Thus appellees state an independent claim under Article III, apart from any monetary injury sustained as a result of the arbitration.

"[R]ipeness is peculiarly a question of timing." *Regional Rail Reorganization Act Cases, supra,* at 140. "[I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 148 (1967). The Article III challenge in *Monsanto* was, in this sense, premature. Monsanto had not alleged that its data had ever been considered in support of other registrations, much less that Monsanto had failed to reach a negotiated settlement or been forced to resort to an unconstitutional arbitration. In fact, no FIFRA arbitrations had as yet taken place when Monsanto brought its claim. Monsanto's claim thus involved "contingent future events that may not

occur as anticipated, or indeed may not occur at all." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532 (1984). By contrast, the FIFRA data-consideration procedures are now in place and numerous follow-on registrations have been issued. See Brief for Appellees 3, n. 3 (citing Docket Entry No. 132, p. 2). Each of the appellees in this action has alleged as yet uncompensated use of its data. App. 23. Stauffer has engaged in an arbitration lasting many months and consuming 2,700 pages of transcript. There is no doubt that the "effects [of the arbitration scheme] have [been felt by Stauffer] in a concrete way." *Abbott Laboratories* v. *Gardner*, 387 U. S., at 148–149.

In addition, "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration" must inform any analysis of ripeness. *Id.*, at 149. The issue presented in this case is purely legal, and will not be clarified by further factual development. Cf. *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 201 (1983). Doubts about the validity of FIFRA's data-consideration and compensation schemes have plagued the pesticide industry and seriously hampered the effectiveness of FIFRA's reforms of the registration process. "To require the industry to proceed without knowing whether the [arbitration scheme] is valid would impose a palpable and considerable hardship." *Id.*, at 201–202. At a minimum Stauffer, and arguably each appellee whose data have been used pursuant to the challenged scheme, suffers the continuing uncertainty and expense of depending for compensation on a process whose authority is undermined because its constitutionality is in question. See *ibid.* "'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Regional Rail Reorganization Act Cases*, 419 U. S., at 143,

quoting *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 593 (1923). Nothing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution of the constitutionality of FIFRA's arbitration scheme. *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 82 (1978).

Finally, appellees clearly have standing to contest EPA's issuance of follow-on registrations pursuant to what they contend is an unconstitutional statutory provision. They allege an injury from EPA's unlawful conduct—the injury of being forced to choose between relinquishing any right to compensation from a follow-on registrant or engaging in an unconstitutional adjudication. *Allen* v. *Wright*, 468 U. S. 737 (1984). Appellees also allege injury which is likely to be redressed by the relief they request. *Ibid.* The use, registration, and compensation scheme is integrated in a single subsection that explicitly ties the follow-on registration to the arbitration. See § 3(c)(1)(D)(ii) (EPA "*shall* deny" or "cancel" follow-on registration if arbitration section is not complied with). It is evident that Congress linked EPA's authority to issue follow-on registrations to the original data submitter's ability to obtain compensation. A decision against the provision's constitutionality, therefore, would support remedies such as striking down the statutory restrictions on judicial review or enjoining EPA from issuing or retaining in force follow-on registrations pursuant to § 3(c)(1)(D)(ii).

### III

Appellees contend that Article III bars Congress from requiring arbitration of disputes among registrants concerning compensation under FIFRA without also affording substantial review by tenured judges of the arbitrator's decision. Article III, § 1, establishes a broad policy that federal judicial power shall be vested in courts whose judges enjoy life tenure and fixed compensation. These requirements protect

the role of the independent judiciary within the constitutional scheme of tripartite government and assure impartial adjudication in federal courts. *United States* v. *Will*, 449 U. S. 200, 217–218 (1980); *Buckley* v. *Valeo*, 424 U. S. 1, 122 (1976) *(per curiam)*.

An absolute construction of Article III is not possible in this area of "frequently arcane distinctions and confusing precedents." *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S., at 90 (opinion concurring in judgment). "[N]either this Court nor Congress has read the Constitution as requiring every federal question arising under the federal law . . . to be tried in an Art. III court before a judge enjoying life tenure and protection against salary reduction." *Palmore* v. *United States*, 411 U. S. 389, 407 (1973). Instead, the Court has long recognized that Congress is not barred from acting pursuant to its powers under Article I to vest decisionmaking authority in tribunals that lack the attributes of Article III courts. See, *e. g.*, *Walters* v. *National Assn. of Radiation Survivors, ante,* p. 305 (Board of Veterans' Appeals); *Palmore* v. *United States, supra* (District of Columbia courts); *Crowell* v. *Benson,* 285 U. S. 22 (1932) (Deputy Commissioner of Employees' Compensation Commission); *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272 (1856) (Treasury accounting officers). Many matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts. See, *e. g.*, 5 U. S. C. §§ 701(a)(1), 701(a)(2); *Heckler* v. *Chaney,* 470 U. S. 821, 837–838 (1985); *United States* v. *Erika, Inc.,* 456 U. S. 201, 206 (1982) (no review of Medicare reimbursements); Monaghan, *Marbury* and the Administrative State, 83 Colum. L. Rev. 1, 18 (1983) (administrative agencies can conclusively adjudicate claims created by the administrative state, by and against private persons); Redish, Legislative Courts, Administrative Agencies, and the *Northern Pipeline* Decision, 1983 Duke L. J. 197 (same).

The Court's most recent pronouncement on the meaning of Article III is *Northern Pipeline*. A divided Court was unable to agree on the precise scope and nature of Article III's limitations. The Court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review. 458 U. S., at 84 (plurality opinion); *id.*, at 90–92 (opinion concurring in judgment); *id.*, at 92 (BURGER, C. J., dissenting).

## A

Appellees contend that their claims to compensation under FIFRA are a matter of state law, and thus are encompassed by the holding of *Northern Pipeline*. We disagree. Any right to compensation from follow-on registrants under § 3 (c)(1)(D)(ii) for EPA's use of data results from FIFRA and does not depend on or replace a right to such compensation under state law. Cf. *Northern Pipeline Construction Co.*, *supra*, at 84 (plurality opinion) (contract claims at issue were matter of state law); *Crowell* v. *Benson*, *supra*, at 39–40 (replacing traditional admiralty negligence action with administrative scheme of strict liability). As a matter of state law, property rights in a trade secret are extinguished when a company discloses its trade secret to persons not obligated to protect the confidentiality of the information. See *Ruckelshaus* v. *Monsanto Co.*, 467 U. S., at 1002, citing R. Milgrim, Trade Secrets § 1.01[2] (1983). Therefore registrants who submit data with notice of the scheme established by the 1978 amendments, and its qualified protection of trade secrets as defined in § 10, can claim no property interest under state law in data subject to § 3(c)(1)(D)(ii). *Ruckelshaus* v. *Monsanto Co.*, *supra*, at 1005–1008. Cf. 21 U. S. C. §§ 348(a)(2), 376(a)(1); 21 CFR § 71.15 (1985); 21 CFR § 171.1(h) (1984) (data submitted under Food, Drug,

and Cosmetic Act is in public domain and follow-on registrants need not submit independent data). Nor do individuals who submitted data prior to 1978 have a right to compensation under FIFRA that depends on state law. To be sure, such users might have a claim that the new scheme results in a taking of property interests protected by state law. See 467 U. S., at 1013–1014. Compensation for any uncompensated taking is available under the Tucker Act. For purposes of compensation under FIFRA's regulatory scheme, however, it is the "mandatory licensing provision" that creates the relationship between the data submitter and the follow-on registrant, and federal law supplies the rule of decision. Cf. *Northern Pipeline Construction Co.*, *supra*, at 90 (opinion concurring in judgment).

Alternatively, appellees contend that FIFRA confers a "private right" to compensation, requiring either Article III adjudication or review by an Article III court sufficient to retain "the essential attributes of the judicial power." *Northern Pipeline Construction Co.*, *supra*, at 77, 85–86 (plurality opinion). This "private right" argument rests on the distinction between public and private rights drawn by the plurality in *Northern Pipeline*. The *Northern Pipeline* plurality construed the Court's prior opinions to permit only three clearly defined exceptions to the rule of Article III adjudication: military tribunals, territorial courts, and decisions involving "public" as opposed to "private" rights. Drawing upon language in *Crowell* v. *Benson*, *supra*, at 50, the plurality defined "public rights" as "matters arising between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." 458 U. S., at 67–68. It identified "private rights" as " 'the liability of one individual to another under the law as defined.' " *Id.*, at 69–70, quoting *Crowell* v. *Benson*, 285 U. S., at 51.

This theory that the public rights/private rights dichotomy of *Crowell* and *Murray's Lessee* v. *Hoboken Land & Im-*

*provement Co.*, 18 How. 272 (1856), provides a bright-line test for determining the requirements of Article III did not command a majority of the Court in *Northern Pipeline*. Insofar as appellees interpret that case and *Crowell* as establishing that the right to an Article III forum is absolute unless the Federal Government is a party of record, we cannot agree. Cf. *Northern Pipeline Construction Co.*, 458 U. S., at 71 (plurality opinion) (noting that discharge in bankruptcy, which adjusts liabilities between individuals, is arguably a public right). But see *id.*, at 69, n. 23. Nor did a majority of the Court endorse the implication of the private right/public right dichotomy that Article III has no force simply because a dispute is between the Government and an individual. Compare *id.*, at 68, n. 20, with *id.*, at 70, n. 23.

B

Chief Justice Hughes, writing for the Court in *Crowell*, expressly rejected a formalistic or abstract Article III inquiry, stating:

> "In deciding whether the Congress, in enacting the statute under review, has exceeded the limits of its authority to prescribe procedure . . . , *regard must be had, as in other cases where constitutional limits are invoked, not to mere matters of form but to the substance of what is required.*" 285 U. S., at 53 (emphasis added).

*Crowell* held that Congress could replace a seaman's traditional negligence action in admiralty with a statutory scheme of strict liability. In response to practical concerns, Congress rejected adjudication in Article III courts and instead provided that claims for compensation would be determined in an administrative proceeding by a deputy commissioner appointed by the United States Employees' Compensation Commission. *Id.*, at 43. "[T]he findings of the deputy commissioner, supported by evidence and within the scope of his authority" were final with respect to injuries to employees within the purview of the statute. *Id.*, at 46. Although

such findings clearly concern obligations among private parties, this fact did not make the scheme invalid under Article III. Instead, after finding that the administrative proceedings satisfied due process, *id.*, at 45–48, *Crowell* concluded that the judicial review afforded by the statute, including review of matters of law, "provides for the appropriate exercise of the judicial function in this class of cases." *Id.*, at 54.

The enduring lesson of *Crowell* is that practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III. Cf. *Glidden Co.* v. *Zdanok*, 370 U. S., at 547–548. The extent of judicial review afforded by the legislation reviewed in *Crowell* does not constitute a minimal requirement of Article III without regard to the origin of the right at issue or the concerns guiding the selection by Congress of a particular method for resolving disputes. In assessing the degree of judicial involvement required by Article III in this case, we note that the statute considered in *Crowell* is different from FIFRA in significant respects. Most importantly, the statute in *Crowell* displaced a traditional cause of action and affected a pre-existing relationship based on a common-law contract for hire. Thus it clearly fell within the range of matters reserved to Article III courts under the holding of *Northern Pipeline*. See 458 U. S., at 70–71, and n. 25 (plurality opinion) (noting that matters subject to a "suit at common law or in equity or admiralty" are at "protected core" of Article III judicial powers); *id.*, at 90 (opinion concurring in judgment) (noting that state law contract actions are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789").

If the identity of the parties alone determined the requirements of Article III, under appellees' theory the constitutionality of many quasi-adjudicative activities carried on by administrative agencies involving claims between individuals would be thrown into doubt. See 5 K. Davis, Administrative Law § 29:23, p. 443 (2d ed. 1984) (concept described as

"revolutionary"); Note, A Literal Interpretation of Article III Ignores 150 Years of Article I Court History: *Marathon Oil Pipeline Co.* v. *Northern Pipeline Construction Co.*, 19 New England L. Rev. 207, 231–232 (1983) ("public rights doctrine exalts form over substance"); Note, The Supreme Court, 1981 Term, 96 Harv. L. Rev. 62, 262, n. 39 (1982). For example, in *Switchmen* v. *National Mediation Board*, 320 U.S. 297 (1943), cited with approval in *South Carolina* v. *Katzenbach*, 383 U. S. 301, 333 (1966), the Court upheld as constitutional a provision of the Railway Labor Act that established a "right" of a majority of a craft or class to choose its bargaining representative and vested the resolution of disputes concerning representation solely in the National Mediation Board, without judicial review. The Court concluded:

> "The Act . . . writes into law the 'right' of the 'majority of any craft or class of employees' to 'determine who shall be the representative of the craft or class for purposes of this Act.' That 'right' is protected by [a provision] which gives the Mediation Board the power to resolve controversies concerning it . . . . A review by the federal district courts of the Board's determination is not necessary to preserve or protect that 'right.' Congress for reasons of its own decided upon the method for protection of the 'right' which it created." 320 U. S., at 300–301.

See also *Union Pacific R. Co.* v. *Price*, 360 U. S. 601, 608 (1959); *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 131, 135 (1944) (Board's conclusions reviewable for rational basis and warrant in the record). Cf. *Leedom* v. *Kyne*, 358 U. S. 184, 199 (1958), (BRENNAN, J., dissenting) (discussing *Switchmen*).

The Court has treated as a matter of "public right" an essentially adversary proceeding to invoke tariff protections against a competitor, as well as an administrative proceeding to determine the rights of landlords and tenants. See *Atlas*

*Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442, 454–455 (1977), citing as an example of "public rights" the federal landlord/tenant law discussed in *Block* v. *Hirsh,* 256 U. S. 135 (1921); *Ex parte Bakelite Corp.,* 279 U. S. 438, 447 (1929) (tariff dispute). These proceedings surely determine liabilities of individuals. Such schemes would be beyond the power of Congress under appellees' interpretation of *Crowell.* In essence, the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that "could be conclusively determined by the Executive and Legislative Branches," the danger of encroaching on the judicial powers is reduced. *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.,* 458 U. S., at 68 (plurality opinion), citing *Crowell* v. *Benson,* 285 U. S., at 50.

C

Looking beyond form to the substance of what FIFRA accomplishes, we note several aspects of FIFRA that persuade us the arbitration scheme adopted by Congress does not contravene Article III. First, the right created by FIFRA is not a purely "private" right, but bears many of the characteristics of a "public" right. Use of a registrant's data to support a follow-on registration serves a public purpose as an integral part of a program safeguarding the public health. Congress has the power, under Article I, to authorize an agency administering a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication. It also has the power to condition issuance of registrations or licenses on compliance with agency procedures. Article III is not so inflexible that it bars Congress from shifting the task of data valuation from the agency to the interested parties. Cf. *United States* v. *Erika, Inc.,* 456 U. S., at 203 (private insurance carrier assigned task of deciding Medicare claims); *Crowell* v. *Benson, supra,* at 50–51.

The 1978 amendments represent a pragmatic solution to the difficult problem of spreading the costs of generating adequate information regarding the safety, health, and environmental impact of a potentially dangerous product. Congress, without implicating Article III, could have authorized EPA to charge follow-on registrants fees to cover the cost of data and could have directly subsidized FIFRA data submitters for their contributions of needed data. See *St. Joseph Stockyards Co.* v. *United States*, 298 U. S. 38, 49–53 (1936) (ratemaking is an essentially legislative function). Instead, it selected a framework that collapses these two steps into one, and permits the parties to fix the amount of compensation, with binding arbitration to resolve intractable disputes. Removing the task of valuation from agency personnel to civilian arbitrators, selected by agreement of the parties or appointed on a case-by-case basis by an independent federal agency, surely does not diminish the likelihood of impartial decisionmaking, free from political influence. See 29 CFR § 1404.4, pt. 1440, App. § 7 (1984). Cf. *Northern Pipeline*, 458 U. S., at 58 (plurality opinion); *id.*, at 115–116 (WHITE, J., dissenting).

The near disaster of the FIFRA 1972 amendments and the danger to public health of further delay in pesticide registration led Congress to select arbitration as the appropriate method of dispute resolution. Given the nature of the right at issue and the concerns motivating the Legislature, we do not think this system threatens the independent role of the Judiciary in our constitutional scheme. "To hold otherwise would be to defeat the obvious purpose of the legislation to furnish a prompt, continuous, expert and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Crowell* v. *Benson, supra*, at 46. Cf. *Palmore* v. *United States*, 411 U. S., at 407–408 (the requirements of Art. III must in proper circumstances give way to accommodate plenary

grants of power to Congress to legislate with respect to specialized areas); *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How., at 282 (citing "[i]mperative necessity" to justify summary tax collection procedures).

We note as well that the FIFRA arbitration scheme incorporates its own system of internal sanctions and relies only tangentially, if at all, on the Judicial Branch for enforcement. See *supra*, at 574–575. The danger of Congress or the Executive encroaching on the Article III judicial powers is at a minimum when no unwilling defendant is subjected to judicial enforcement power as a result of the agency "adjudication." See, *e. g.*, Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362 (1953), reprinted in P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 330 (2d ed. 1973); Monaghan, *Marbury* and the Administrative State, 83 Colum. L. Rev. 1, 16 (1983); L. Jaffe, Judicial Control of Administrative Action 385 (1965) (historically judicial review of agency decisionmaking has been required only when it results in the use of judicial process to enforce an obligation upon an unwilling defendant).

We need not decide in this case whether a private party could initiate an action in court to enforce a FIFRA arbitration. But cf. 29 CFR pt. 1440, App. § 37(c) (1984) (under rules of American Arbitration Association, parties to arbitration are deemed to consent to entry of judgment). FIFRA contains no provision explicitly authorizing a party to invoke judicial process to compel arbitration or enforce an award. Compare § 3(c)(1)(D)(ii), 7 U. S. C. § 136a(c)(1)(D)(ii), with § 10(c), 7 U. S. C. § 136h(c) (authorizing applicant or registrant to institute action in district court to settle dispute with Administrator over trade secrets); 29 U. S. C. § 1401 (b)(2) (Employee Retirement Income Security Act provision authorizing parties to arbitration to bring enforcement action in district court); *Union Pacific R. Co.* v. *Price*, 360 U. S.,

at 614, and n. 12 (statute authorized court enforcement of National Railroad Adjustment Board's money damages award); and *Crowell* v. *Benson*, 285 U. S., at 44 (providing for entry of judgment in federal court). Cf. *Utility Workers* v. *Edison Co.*, 309 U. S. 261 (1940) (as award to worker vindicates a "public right," agency alone has authority to institute enforcement proceeding). In any event, under FIFRA, the only potential object of judicial enforcement power is the follow-on registrant who explicitly consents to have his rights determined by arbitration. See 40 CFR § 162.9–5(b) (1984) (registration application must contain a written offer to pay compensation "to the extent required by FIFRA section 3(c)(1)(D)").

Finally, we note that FIFRA limits but does not preclude review of the arbitration proceeding by an Article III court. We conclude that, in the circumstances, the review afforded preserves the "appropriate exercise of the judicial function." *Crowell* v. *Benson, supra*, at 54. FIFRA at a minimum allows private parties to secure Article III review of the arbitrator's "findings and determination" for fraud, misconduct, or misrepresentation. § 3(c)(1)(D)(ii). This provision protects against arbitrators who abuse or exceed their powers or willfully misconstrue their mandate under the governing law. Cf. *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 597 (1960) (arbitrator must be faithful to terms of mandate and does not sit to administer his "own brand of industrial justice"). Moreover, review of constitutional error is preserved, see *Walters* v. *National Assn. of Radiation Survivors, ante*, at 311, n. 3; *Johnson* v. *Robison*, 415 U. S. 361, 367–368 (1974), and FIFRA, therefore, does not obstruct whatever judicial review might by required by due process. Cf. *Crowell* v. *Benson*, 285 U. S., at 46; *id.*, at 87 (Brandeis, J., dissenting). We need not identify the extent to which due process may require review of determinations by the arbitrator because the parties stipulated below to

abandon any due process claims.[4]  See n. 2, *supra.*  For purposes of our analysis, it is sufficient to note that FIFRA does provide for limited Article III review, including whatever review is independently required by due process considerations.

## IV

Appellees raise Article I as an alternative ground for sustaining the judgment of the District Court.  Cf. *Dandridge* v. *Williams,* 397 U. S. 471, 475, n. 6 (1970).  Appellees argued below that FIFRA's standard for compensation is so vague as to be an unconstitutional delegation of legislative powers.  See *A. L. A. Schecter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935).  A term that appears vague on its face "may derive much meaningful content from the purpose of the Act, its factual background, and the statutory context."  *American Power & Light Co.* v. *SEC,* 329 U. S. 90, 104 (1946).  Although FIFRA's language does not impose an explicit standard, the legislative history of the 1972 and 1978 amendments is far from silent.  See, *e. g.,* S. Conf. Rep. No. 95–1188, p. 29 (1978); 1977 S. Rep., at 4, 8, 31; 1972 S. Rep., pt. 2, pp. 69, 72–73; Hearings on Extending and Amending FIFRA before the Subcommittee on Department Investigations, Oversight, and Research of the House Committee on Agriculture, 95th Cong., 1st Sess., *passim* (1977). The Article I claim, however, was neither adequately briefed nor argued to this Court and was not fully litigated before the District Court.  Without expressing any opinion on the merits, we leave the issue open for determination on remand.

## V

Our holding is limited to the proposition that Congress, acting for a valid legislative purpose pursuant to its con-

---

[4] As noted *supra,* at 585, appellees retain Tucker Act claims in the District Courts or in the United States Claims Court with review in the Court of Appeals for the Federal Circuit for any shortfall between the arbitration award and the value of trade secrets submitted between 1972 and 1978.

stitutional powers under Article I, may create a seemingly "private" right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary. To hold otherwise would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures such as negotiation and arbitration with respect to rights created by a regulatory scheme. For the reasons stated in our opinion, we hold that arbitration of the limited right created by FIFRA § 3(c)(1)(D)(ii) does not contravene Article III. The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in the judgment.

Our cases of both recent and ancient vintage have struggled to pierce through the language of Art. III of the Constitution to the full meaning of the deceptively simple requirement that "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, § 1. We know that those who framed our Constitution feared the tyranny of "accumulation of all powers, legislative, executive, and judiciary, in the same hands," The Federalist No. 47, p. 300 (H. Lodge ed. 1888) (J. Madison), and sought to guard against it by dispersing federal power to three interdependent branches of Government. Each branch of Government was intended to exercise a distinct but limited power and function as a check on any aggrandizing tendencies in the other branches. See *Buckley* v. *Valeo,* 424 U. S. 1, 122 (1976) *(per curiam).* The salary and tenure guarantees of Art. III—reflecting Hamilton's observation that "a power over a man's subsistence amounts

to a power over his will," The Federalist No. 79, p. 491
(H. Lodge ed. 1888)—were thought essential to the Judi-
ciary's ability to function effectively as a check on Congress
and the Executive. It is thus clear that when Congress
establishes courts pursuant to Art. III the judges presiding
in those courts must receive salary and tenure guarantees.
The difficult question is to what extent the need to preserve
the Judiciary's checking function requires Congress to assign
the Federal Government's decisionmaking authority to inde-
pendent tribunals so constituted.

*Northern Pipeline Construction Co.* v. *Marathon Pipe
Line Co.*, 458 U. S. 50 (1982), is the Court's most recent
attempt at defining the limits Art. III places on the power of
Congress to assign adjudicative authority to decisionmakers
not protected by tenure and salary guarantees. We faced
the question whether, under the federal Bankruptcy Act of
1978, 92 Stat. 2549, a federal bankruptcy court whose
decisionmaker did not benefit from those guarantees could be
empowered to render the entire initial adjudication of a state
common-law cause of action. The issue was, in other words,
whether Art. III permitted assignment of any essential
attributes of the "judicial Power" to a non-Art. III federal
decisionmaker when state law prescribed the rule of decision
in a dispute between private parties. The Court invalidated
the congressional action but a majority did not agree upon a
common rationale. The plurality would have held that this
allocation of decisional authority could not be justified as a
proper exercise of either the congressional power to create
Art. I legislative courts or the congressional power to create
adjuncts to Art. III courts. 458 U. S., at 63–87. JUSTICE
REHNQUIST, in a concurring opinion joined by JUSTICE
O'CONNOR, would simply have held that Congress may not
assign the power to adjudicate a traditional state common-
law action to a non-Art. III tribunal even given the "tradi-
tional appellate review" by an Art. III court afforded under
the challenged bankruptcy statute. *Id.*, at 90–91.

Because the appellees in *Northern Pipeline* had argued that bankruptcy court jurisdiction over state-law contract claims could be justified as an exercise of Congress' Art. I power to create legislative courts, the plurality examined the basis and scope of that congressional power as it has been explicated in our precedents. The plurality concluded that notwithstanding the commands of Art. III Congress could create such legislative courts for three categories of cases: territorial courts, courts-martial, and courts that adjudicate public rights disputes. The only serious question in *Northern Pipeline* was whether the disputed bankruptcy court jurisdiction fell into the third category.

The plurality opinion concluded that public rights cases, as that concept had come to be understood, involved disputes arising from the Federal Government's administration of its laws or programs.[1] 458 U. S., at 68–69. The plurality

---

[1] In *Ex parte Bakelite Corp.*, 279 U. S. 438 (1929), public rights disputes were described as those "which may be . . . committed exclusively to executive officers." *Id.*, at 458. In this regard it is worth noting that early cases recognizing a public rights doctrine typically involved either challenges to Government action affecting private interests in which at the time no constitutional claim of entitlement was recognized, *e. g., United States* v. *Babcock*, 250 U. S. 328, 331 (1919); *Decatur* v. *Paulding*, 14 Pet. 497 (1840), or challenges by one private party seeking exercise of the Federal Government's enforcement authority against another private party not before the court, *e. g., Ex parte Bakelite Corp., supra.* The original theory would seem to have been that because Congress had absolute power to dispose of such issues as it saw fit without resort to the Judiciary, it could assign decisionmaking authority to Art. I courts.

The underpinnings of the original theory, of course, have not survived intact. We now recognize an entitlement in certain forms of government assistance. *Goldberg* v. *Kelly*, 397 U. S. 254 (1970). And we have recently made clear that government is not free to dispose of individual claims of entitlement in any manner it deems fit. *Cleveland Board of Education* v. *Loudermill*, 470 U. S. 532 (1985). Also, such reasoning is not consistent with the doctrine of unconstitutional conditions. See *Speiser* v. *Randall*, 357 U. S. 513 (1958). The erosion of these underpinnings does not, however, mandate the conclusion that disputes arising in the administration of federal regulatory programs may not be resolved

expressly disclaimed any intention to provide a generally applicable definition of "public rights" but concluded that at a minimum public rights disputes must arise " 'between the Government and others.' " *Id.*, at 69, quoting *Ex parte Bakelite Corp.*, 279 U. S. 438, 458 (1929). The dispute at issue in *Northern Pipeline* was found by the plurality not to fall into the public rights category because state law created the right and provided the rule of decision as between the private parties litigating the dispute, irrespective of the existence of the federal bankruptcy scheme. 458 U. S., at 72, n. 26 ("Even in the absence of the federal scheme, the plaintiff would be able to proceed against the defendant on the state-law contractual claims"). In no sense could the dispute be said to be about the propriety or accuracy of a determination made by an organ of the Federal Government in administration or execution of a federal regulatory scheme. Whatever the precise scope of the public rights doctrine, that case was clearly outside it and therefore adjudication before an Art. III decisionmaker or properly constituted adjunct was required.[2] Because the challenged bankruptcy jurisdiction could not be sustained on the alternative rationale that it was a proper adjunct to an Art. III court, *id.*, at 77–86 (plurality opinion); *id.*, at 91 (REHNQUIST, J., concurring in judgment), the statute embodying the jurisdictional grant was declared unconstitutional.

---

through Art. I adjudication. The term "public rights" as now understood encompasses those "matters arising between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Northern Pipeline*, 458 U. S., at 67–68, that need not be fully adjudicated in an Art. III forum or a properly constituted adjunct to such a forum.

[2] "What clearly remains subject to Art. III are all private adjudications in federal courts within the States—matters from their nature subject to a 'suit at common law or in equity or admiralty.' . . . There is no doubt that when the Framers assigned the 'judicial Power' to an independent Art. III Branch, these matters lay at what they perceived to be the protected core of that power." *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, *supra*, at 70–71, n. 25.

Analysis of the present case properly begins with the recognition that it differs substantially from the issue in *Northern Pipeline*. The present case arises entirely within the regulatory confines of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U. S. C. § 136 *et seq.* This federal statute prescribes both the terms of compensation and the procedures for arriving at the proper amount of compensation in any given case. See 7 U. S. C. § 136a(c) (1)(D)(ii) (providing for negotiation followed by binding arbitration to set amounts "follow-on" registrants must pay in compensation for use of test data). Thus the question for decision here is whether fixing the amount of compensation for test data under FIFRA can be characterized as a public rights dispute that need not be adjudicated from the outset in an Art. III court or a properly constituted adjunct to such a court.[3] Should it be concluded that this is such a dispute, the further issue must be confronted of whether some form of appellate oversight by an Art. III court is nonetheless required, see *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 455, n. 13 (1977), and, if so, whether this statute's provision of review only for "fraud, misrepresentation, or other misconduct" suffices. 7 U. S. C. § 136a(c)(1)(D)(ii).

I agree with the Court that the determinative factor with respect to the proper characterization of the nature of the dispute in this case should not be the presence or absence of the Government as a party. See *ante*, at 586. Despite the Court's contrary suggestions, the plurality opinion in *Northern Pipeline* suggests neither that "the right to an Article III forum is absolute unless the Federal Government is a party of record" nor that "Article III has no force simply because a dispute is between the Government and an individual."

---

[3] As the Court correctly concludes, there is no tenable argument that appellees in this case will be forced to undergo an Art. I adjudication of a state-law claim that arises between private parties, as was the case in *Northern Pipeline*. See *ante*, at 584–585.

*Ante*, at 586.   Properly understood, the analysis elaborated by the plurality in *Northern Pipeline* does not place the Federal Government in an Art. III straitjacket whenever a dispute technically is one between private parties.   We recognized that a bankruptcy adjudication, though technically a dispute among private parties, may well be properly characterized as a matter of public rights.   458 U. S., at 50. The plurality opinion's reaffirmation of the constitutionality of the administrative scheme at issue in *Crowell* v. *Benson*, 285 U. S. 22 (1932), similarly suggests that a proper interpretation of Art. III affords the Federal Government substantial flexibility to rely on administrative tribunals.   See *Northern Pipeline*, 458 U. S., at 69, n. 22, 78–80.   The plurality opinion should not be read to imply that reliance on administrative agencies for ratemaking or other forms of regulatory adjustments of private interests is necessarily suspect. Cf. *Leedom* v. *Kyne*, 358 U. S. 184, 191 (1958) (BRENNAN, J., dissenting).

Nor does the approach of the *Northern Pipeline* plurality opinion permit Congress to sap the Judiciary of all its checking power whenever the Government is a party.   The opinion made clear that "the presence of the United States as a proper party to the proceeding is . . . not [a] sufficient means of distinguishing 'private rights' from 'public rights.'"   458 U. S., at 69, n. 23.   At a minimum, Art. III must bar Congress from assigning to an Art. I decisionmaker the ultimate disposition of challenges to the constitutionality of Government action, either legislative or executive.   Cf. *United States* v. *Raddatz*, 447 U. S. 667, 708–712 (1980) (MARSHALL, J., dissenting).   Also, the plurality opinion was careful to leave open the question whether and to what extent even the resolution of public rights disputes might require some eventual review in an Art. III court in the exercise of its responsibility to check an impermissible accumulation of power in the other branches of Government.   458 U. S., at 70, n. 23; see also *id.*, at 115 (WHITE, J., dissenting) ("[A] scheme of

Art. I courts that provides for appellate review by Art. III courts should be substantially less controversial than a legislative attempt entirely to avoid judicial review in a constitutional court"); *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n, supra,* at 455, n. 13. Because the approach of the plurality opinion in *Northern Pipeline* is sufficiently flexible to accommodate the demands of contemporary Government while preserving the constitutional system of checks and balances, I adhere to it as the proper analysis for resolving the present case.

Though the issue before us in this case is not free of doubt, in my judgment the FIFRA compensation scheme challenged in this case should be viewed as involving a matter of public rights as that term is understood in the line of cases culminating in *Northern Pipeline.* In one sense the question of proper compensation for a follow-on registrant's use of test data is, under the FIFRA scheme, a dispute about "the liability of one individual to another under the law as defined," *Crowell* v. *Benson, supra,* at 51 (defining matters of private right). But the dispute arises in the context of a federal regulatory scheme that virtually occupies the field. Congress has decided that effectuation of the public policies of FIFRA demands not only a requirement of compensation from "follow-on" registrants in return for mandatory access to data but also an administrative process—mandatory negotiation followed by binding arbitration—to ensure that unresolved compensation disputes do not delay public distribution of needed products. This case, in other words, involves not only the congressional prescription of a federal rule of decision to govern a private dispute but also the active participation of a federal regulatory agency in resolving the dispute. Although a compensation dispute under FIFRA ultimately involves a determination of the duty owed one private party by another, at its heart the dispute involves the exercise of authority by a Federal Government arbitrator in the course of administration of FIFRA's comprehensive regulatory

scheme. As such it partakes of the characteristics of a standard agency adjudication. Cf. *Leedom* v. *Kyne, supra,* at 191 (BRENNAN, J., dissenting).[4]

Given that this dispute is properly understood as one involving a matter in which Congress has substantial latitude to make use of Art. I decisionmakers, the question remains whether the Constitution nevertheless imposes some requirement of Art. III supervision of the arbitrator's decisions under this scheme. In this case Congress has provided for review of arbitrators' decisions to ensure against "fraud, misrepresentation, or other misconduct." The Court therefore need not reach the difficult question whether Congress is always free to cut off all judicial review of decisions respecting such exercises of Art. I authority.

The review prescribed under FIFRA encompasses the authority to invalidate an arbitrator's decision when that decision exceeds the arbitrator's authority or exhibits a manifest disregard for the governing law. See *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960); *Wilko* v. *Swan,* 346 U. S. 427, 436–437 (1953). Such review preserves the judicial authority over questions of law in the present context. Cf. *Crowell* v. *Benson, supra,* at 54. In essence, the FIFRA scheme delegates a significant case-

---

[4] Although the essential function of the Judiciary is to "say what the law is," *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803), the exercise of this power with respect to the interpretation of federal statutory law may not be the power that constrains the actions of the Legislative Branch. Congress is always free to reject this Court's interpretation of a federal statute by passing a new law. It may rather be that the exercise of the Court's power of judicial review to ensure constitutionality is what restrains the exercise of legislative power. The power to interpret federal statutory law could be seen as acting as a check on the exercise of the executive power—or the power of administrative agencies whether or not they are considered as under the head of executive authority—given that what courts do when they review agency action, both rulemaking and adjudication, is ensure that the reviewed action has not departed from congressional intent.

by-case lawmaking function to the arbitrator in compensation disputes. So long as this delegation is constitutionally permissible—an issue left open on remand—and judicial review to ensure that the arbitrator's exercise of authority in any given case does not depart from the mandate of the delegation, the Judiciary will exercise a restraining authority sufficient to meet whatever requirements Art. III might impose in the present context.[5]

For these reasons, I agree with the Court that the FIFRA arbitration scheme does not violate the mandates of Art. III, and I would therefore reverse the judgment of the District Court and remand for further proceedings.

JUSTICE STEVENS, concurring in the judgment.

This appeal presents a question under Article III, but one which differs from that addressed by the Court and whose answer prevents me from reaching the merits of appellees' claims.

Appellees, plaintiffs in the District Court, challenge the constitutionality of an "arbitration procedure that [allegedly] violates their right to an adjudication that complies with" Article III insofar as it empowers civilian arbitrators to determine the amount of compensation they are entitled to receive for use of their research data. Amended Complaint for Declaratory Judgment and Injunction ¶¶ 20–21, App. 23–24. The relief they claim against the Environmental Protection Agency and its Administrator (collectively referred to as the agency, EPA, or the Administrator) is a declaration of unconstitutionality and an injunction against use of their data in the agency's processing of applications filed by third parties. See id., at 24.

---

[5] It is also important to note that the Due Process Clause of the Fifth Amendment imposes, as the Court correctly notes, independent constraints on the ability of Congress to establish particular forums for dispute resolution under Art. I. See ante, at 592. Cf. Crowell v. Benson, 285 U. S., at 87 (Brandeis, J., dissenting).

In § 3(c)(1)(D)(ii) of the Federal Insecticide, Fungicide, and Rodenticide Act,[1] Congress provided appellees with a contingent form of protection against the EPA's use of certain of their research data: "[T]he Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the 'applicant') . . . *only if* the applicant has made an offer to compensate the original data submitter . . . ." 92 Stat. 821, 7 U. S. C. § 136a(c)(1)(D)(ii) (emphasis added). Appellees' research data may not be used to process a third party's application unless that party offers to compensate appellees in an amount that is "fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration." *Ibid.* But if the third party consents to this procedure for determining the appropriate compensation, there is no statutory restraint on EPA's use of the data.[2]

---

[1] The text of § 3(c)(1)(D)(ii) is quoted in full *ante*, at 574–575, n. 1.

[2] Under appellees' reading of § 3(c)(1)(D)(ii), compensation is a condition precedent to EPA's use of their research data to evaluate applications by third parties. See Amended Complaint for Declaratory Judgment and Injunction ¶ 20, App. 23. Because the statutorily required arbitration procedure violates Article III, they reason, compensation cannot be awarded and the condition precedent to EPA's use of data cannot be fulfilled. *Ergo,* an injunction must issue against the agency.

Appellees, however, misread the statute. Section 3(c)(1)(D)(ii) conditions the Administrator's use of their data on a third party's "*offer* to compensate," not upon actual compensation. 92 Stat. 821, 7 U. S. C. § 136a(c)(1)(D)(ii) (emphasis added); accord, § 3(c)(1)(D)(iii), 92 Stat. 822, 7 U. S. C. § 136a(c)(1)(D)(iii). Indeed, the same section later provides that "[r]egistration action by the Administrator shall not be delayed pending the fixing of compensation." 92 Stat. 822, 7 U. S. C. § 136a(c)(1)(D)(ii). A straightforward reading of this section demonstrates that EPA is not disabled from using research data to process "follow-on" registrations pending compensation of appellees. I find nothing in the legislative history that contradicts this interpretation, and it is consistent with Congress' "vie[w] [of] data-sharing as essential to the registration scheme," *ante,* at

Appellees make no claim that the Administrator has used any of their data without obtaining the consent required by the statute. Thus, the statute provides no basis for any relief against EPA. And if we should declare § 3(c)(1)(D)(ii) unconstitutional, there is no other basis of which I am aware

573, and with the Legislature's consequent desire to break "the 'logjam of litigation that resulted from controversies over data compensation and trade secret protection,'" *ibid.* (quoting S. Rep. No. 95–334, p. 3 (1977)). See *id.*, at 3 ("The single largest problem is the fact that the registration and reregistration process has ground to a virtual halt. . . . Since registration is critical, this program must be made to work"). Congress surely desired both that EPA have use of appellees' data and that appellees be compensated for such use. But there is no evidence to indicate that Congress intended these complementary provisions to be mutually dependent. See § 30, 92 Stat. 836, 7 U. S. C. § 136x ("If any provision of this [Act] . . . is held invalid, the invalidity shall not affect other provisions . . . which can be given effect without regard to the invalid provision . . . and to this end the provisions of this [Act] are severable"); cf. *INS* v. *Chadha,* 462 U. S. 919, 931–935 (1983).

The sentence the Court believes "ties the follow-on registration to the arbitration," *ante,* at 582, is beside the point. Section 3(c)(1)(D)(ii) requires the Administrator to "deny the application or cancel the registration of the pesticide" if the third-party "follow-on" applicant "has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation." 92 Stat. 821, 7 U. S. C. § 136a(c)(1)(D)(ii). This sentence is obviously addressed to defaults by third-party "follow-on" applicants in the registration process and hardly suggests that Congress would have scrapped the entire data-use provision if the compensation component was found unconstitutional. To restate the obvious, Congress undoubtedly intended that EPA have use of original applicants' research data *and* that such use be recompensed—the statute, after all, provides for both. But the Legislature's unequivocal intention to facilitate pesticide registrations and the presence of an express severability provision (accompanied by the traditional duty "to save and not to destroy," *Tilton* v. *Richardson,* 403 U. S. 672, 684 (1971)), makes it rather unlikely that Congress gambled the entire pesticide registration process on the constitutionality of a provision for arbitrable compensation. I therefore conclude that even if we invalidated the compensation clauses appellees would have no right to an injunction against EPA's use of appellees' research data.

for interfering with the agency's use of appellees' data. See *ante*, at 584–585; *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1016–1019 (1984). Therefore, whether or not the arbitration provision is constitutional, there is no basis for enjoining EPA's use of appellees' research data.

For a party to have standing to invoke the jurisdiction of a federal court "relief from the injury must be 'likely' to follow from a favorable decision." *Allen* v. *Wright*, 468 U. S. 737, 751 (1984); accord, *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982); *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S. 26, 38, 43–46 (1976); *Warth* v. *Seldin*, 422 U. S. 490, 507 (1975); *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 618–619 (1973). Because § 3(c)(1)(D)(ii) does not give appellees any legal basis for claiming that they have been harmed by anything EPA did or threatened to do, a decision that FIFRA's arbitration provisions violate Article III could not support an injunction against the Administrator's use of appellees' data. Accordingly, appellees do not have standing to challenge the constitutionality of § 3(c)(1)(D)(ii) in this action.[3] For this reason, I agree that the judgment of the District Court must be reversed.

---

[3] The District Court held that appellees had standing to challenge FIFRA's arbitration provisions because "plaintiffs' injuries here would be the direct product of the statutory plan." *Union Carbide Agricultural Products Co.* v. *Ruckelshaus*, 571 F. Supp. 117, 123, n. 2 (SDNY 1983). This analysis is incomplete: "The injury must be 'fairly' traceable to the challenged action, *and* relief from the injury must be 'likely' to follow from a favorable decision." *Allen* v. *Wright*, 468 U. S., at 751 (emphasis added); accord, *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S., at 472. These two components of the Article III causation requirement are distinct: The "fairly traceable" component "examines the causal connection between the assertedly unlawful conduct and the alleged injury"; the "redressability" component "examines the causal connection between the alleged injury and the judicial relief requested." *Allen* v. *Wright, supra*, at 753, n. 19. "[I]t is important to keep the inquiries separate." *Ibid.*