215 ALLIANCE, Community Stabilization Project, and Christine Learned, Plaintiffs,

v.

Andrew CUOMO, in his official capacity as Secretary of the Department of Housing and Urban Development; the United States Department of Housing and Urban Development; and Oak Grove Towers Associates, Defendants.

No. Civ. 98–64 (DWF/AJB).

United States District Court,
D. Minnesota.

Aug. 30, 1999.

Ann Norton, Jack Cann, St. Paul, MN, for plaintiffs.

Fred Siekert, Assistant U.S. Attorney, Minneapolis, MN, Stephen Gronewold, Chief Counsel, Minnesota State Office of the Department of Housing and Urban Development, for defendants.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter came on for hearing before the undersigned United

States District Judge on August 20, 1999, pursuant to Defendants Andrew Cuomo and the Department of Housing and Urban Development's Motion for Summary Judgment and the Plaintiffs' Motion for Partial Summary Judgment. In the Complaint, Plaintiffs allege various violations of Minnesota and federal law with respect to the prepayment of a HUD-insured mortgage, the termination of two project-based Section 8 contracts, and the subsequent provision of tenant-based subsidy vouchers. For the reasons set forth below, Plaintiffs' motion is granted and Defendants' motion is granted in part and denied in part.

## Background

Oak Grove Towers is a housing facility located at 215 Oak Grove, Minneapolis, and owned by Defendant Oak Grove Towers Associates ("owners"). Oak Grove Towers is occupied primarily by low and moderate income individuals and families. Many of these residents are elderly and/or disabled. The average household income for the Oak Grove Towers tenants is $8,500 per year. Plaintiff 215 Alliance is an organization of tenants residing in the Oak Grove Towers complex; Plaintiff Christine Learned is an individual tenant of Oak Grove Towers whose tenancy is affected by the government subsidies at issue here. Plaintiff Community Stabilization Project is a Minnesota non-profit corporation which seeks to preserve existing low-income housing and to secure the availability of more such housing in Minnesota.

Until July 30, 1997, Oak Grove Towers was financed by a mortgage insured by the Department of Housing and Urban Development (HUD) and issued pursuant to Section 236 of the National Housing Act. Under the terms of the statute, the mortgage was contingent upon the owners renting to low and moderate income tenants and providing such tenants rental rates below the market rate. In addition to the HUD mortgage, the owners also enjoyed the benefit of two project-based Section 8 contracts (the "Housing Assistance Payments contracts" or "HAP contracts") which were renewed with HUD on an annual basis. For purposes of this litigation, the two HAP contracts at issue are the MN46–L000–028 contract, which ran from September 30, 1996, to September 30, 1997, and which provided rent subsidies for 75 units; and the MN46–L000–092 contract, which ran from October 31, 1996, to October 31, 1997, and which provided rent subsidies for 91 units.

On March 21, 1996, the owners posted a notice to tenants indicating that management had renewed the MN46–L000–028 contract for project-based subsidization for the September 30, 1996, to September 30, 1997, term. The notice stated that

> [T]here is no guarantee, at the end of this one-year term, that the Department of Housing and Urban Development (HUD) will extend our project-based contract.
>
> As project owners participating in the section 8 program, we are required to provide you with one year's notice of the expiration or termination of our building's section 8 assistance. To fulfill this one-year notification requirement, we hereby notify you that, in the absence of a further extension, the section 8 project-based assistance attached to your apartment will expire on September 30, 1997.

Declaration of Mark Campbell, Ex. B. The notice made no reference to the other HAP contract[1] or to the HUD mortgage. Moreover, the notice referenced only one eventuality which might, hypothetically, lead to termination of the MN46–L000–028 contract: HUD's possible decision not to extend the contract.

---

1. In early March of 1996, HUD's Office of Housing in Washington, D.C., informed its field offices of the particularly precarious position of project-based funding in light of recent Congressional action. HUD ordered its field offices to notify owners with contracts expiring between July 1, and September 30, 1996, of this heightened uncertainty and to urge those owners to notify tenants. Thus, it was Contract No. MN46–L000–028, which expired during this time period, which prompted the notice.

In a letter dated January 7, 1997, the owners of Oak Grove notified HUD that they wished to prepay the HUD-insured mortgage and cease participation in the project-based assistance program effective October 30, 1997 (when the last of the existing contracts expired). In that letter, the owners expressed their belief that the March 21, 1996, posting constituted notice to the tenants of the expiration of the various HUD subsidies and requested confirmation from HUD of this fact. On January 15, 1997, HUD sent a letter to the owners through the management of Oak Grove Towers indicating its opinion that the March 21, 1996, posting constituted sufficient notice to the tenants.

In June of 1997, Oak Grove management notified its tenants that the mortgage was being prepaid and that their project-based subsidy would be expiring in the fall of that year, at which point their rents would increase. The notice further stated that the tenants might be eligible for tenant-based subsidies which they could use to offset the higher rents at Oak Grove or which they could use to offset rent at another facility. In September of 1997, the tenants learned of HUD's determination that the notice given to them of the termination had been sufficient.

Many of the tenants became eligible for "enhanced vouchers" provided by HUD pursuant to P.L. 104–204.[2] However, while the tenants formerly covered by the HAP contracts had received free parking pursuant to those contracts, the enhanced vouchers offset only rent. Accordingly, these tenants were now responsible for $45 each month to pay for a parking space in the facility's ramp.[3] Thus, even with tenant-based subsidies which prevented an increase in out-of-pocket expenditures for rent, the out-of-pocket expenses of the tenants formerly covered by the HAP contracts increased by $540 per year.

Moreover, HUD issued a notice entitled PIH 98–19 on April 3, 1998, which indicated HUD's interpretation of the enhanced voucher program. Specifically, HUD stated that it would not increase the amount of enhanced vouchers to individuals to keep pace with any rent increases occurring more than one year after cessation of the project-based assistance.

Initially, the Plaintiffs sued HUD and the owners for failure to provide adequate notice of the termination of the project-based subsidy. The tenants later amended their complaint to allege violation of Public Law 104–204: specifically, that HUD's interpretation of the enhanced voucher program as stated in PIH 98–19 was contrary to the plain meaning of the statute and Congress's intent.

On May 11, 1998, Plaintiff tenants stipulated to a dismissal of Oak Grove Towers Associates. In return, the owners agreed to accept enhanced tenant vouchers for as long as they were available through HUD; to provide free of charge a parking space to each voucher tenant who needs one from October 1, 1998, to September 30, 1999; to refrain from raising rent for any voucher tenant until October 1, 1999; and to provide free parking to aides providing assistance to disabled voucher tenants. HUD now asserts that the dismissal of Oak Grove Towers Associates and the negotiated agreement which prompted it render all allegations surrounding the issue of notice moot.

### Discussion

#### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn

2. Public Law 105–276 renewed the enhanced voucher program.

3. The Court takes judicial notice that street parking in the vicinity of Oak Grove Towers is

extremely limited. Moreover, as many of the tenants involved are elderly or disabled, their ability to walk from the project to a street parking space several blocks away is compromised.

from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

## 2. Justiciability

As a preliminary matter, the Government has challenged the justiciability of the two primary issues before the Court, one on the ground of mootness and the other on the ground of ripeness.

*Mootness*

█ With respect to the question of the adequacy of the notice given to the Oak Grove tenants, the Government asserts that the settlement agreement between the Plaintiffs and the owners renders any challenge to the notice moot. Specifically, under the terms of the stipulation, the owners refrained from raising the rent beyond what was covered by the tenant-based vouchers and provided parking consistent with the pre-termination arrangement, all for a period of one year. From the perspective of the tenants, then, the *status quo ante* was maintained for a year past the termination of the last HAP contract.[4] The Government contends that a year of the status quo put the tenants in the same position in which they otherwise would have been had they been given adequate notice.

The Government's argument is premised in part on a misconstruction of the Plaintiffs' allegations. In part, the Plaintiffs argue that HUD had an obligation pursuant to 42 U.S.C. § 1437f(c)(9) to use the owners' inadequate notice—to both the tenants *and to HUD*—as a means of preventing the termination of the contracts and the prepayment of the mortgage. To that end, no temporary relief can place the tenants in the position in which they would have been if HUD had fulfilled its obligations. Indeed, some of the Oak Grove tenants were apparently not eligible for tenant-based subsidies, but were nevertheless enjoying below-market rents as a result of the Section 236 mortgage[5]; the settlement agreement reached between the Plaintiffs and the owners provides no relief to these tenants who, upon termination of the project-based subsidies, were immediately responsible for the full rent and who have not been provided with free parking pursuant to the settlement agreement. The Plaintiffs have asserted that, with adequate notice, they might have been able to find a party willing to purchase Oak Grove

---

4. With respect to the parking issue, the stipulation provides for free parking from October 1, 1998, to September 30, 1999. It is unclear to the Court whether the tenants were required to pay for parking from the time of termination of the HAP contracts (September 30 and October 31, 1997) until the parking provisions of the stipulation went into effect in October of 1998.

5. The record is not clear regarding how many of the tenants of Oak Grove were ineligible for enhanced vouchers, but the record does indicate that at least a handful of tenants were left without any form of rent subsidy.

Towers and renew the project-based subsidies with HUD.

■ Moreover, Plaintiff Community Stabilization Project's interest in the declaratory judgment sought transcends the injury to the tenants of Oak Grove Towers. First, the Community Stabilization Project ("CSP") asserts standing as a representative of the Oak Grove tenants specifically and other subsidized tenants more generally. To assert standing as a representative, an organization must demonstrate: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In this case, the second and third prongs of the analysis are clearly met; the CSP is organized to protect and promote the availability of low-income housing, an interest which is certainly implicated by HUD's regulations, and a request for declaratory judgment does not require the participation of individual plaintiffs. Arguably, the first prong of the analysis is defeated if the Court were to concede that the issue is moot with respect to the Oak Grove tenants. However, the CSP represents other low-income tenants, tenants who will potentially be affected by HUD's interpretation of the statutory notice requirements. To that end, the CSP's representative interest in declaratory judgment survives any settlement which may moot the interest of these particular tenants. Similarly, the CSP's representation would appear to extend to those Oak Grove Towers tenants who did not qualify for tenant-based subsidies and whose interest is definitely not moot.

■ Finally, and perhaps most importantly, the CSP asserts an interest in its own behalf which has not been mooted by the settlement between the Oak Grove tenants and the owners. Specifically, the CSP has asserted a claim for injury arising out of the loss of housing units as a result of HUD's failure to use the fact of inadequate notice as an affirmative defense against termination of the HAP contracts and prepayment of the mortgage.[6] An organization may sue seeking declaratory judgment if the allegedly illegal practice impairs the organization's ability to fulfill its purpose. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Here, HUD's policy with respect to the notice requirements for termination of project-based subsidies presents a challenge to the goal of promoting the availability of low-income housing which is "far more than simply a setback to the organization's abstract social interests." *Id.* The CSP has had to face the mad scramble to protect the interests of low-income tenants in the face of inadequate notice and will doubtless be compelled to face such a crisis again in the absence of the declaratory relief sought.[7]

### Ripeness

■ The Government argues that, because there has not yet been a rent increase beyond that covered by the initial enhanced voucher grant, the Plaintiffs have not endured any injury; accordingly,

---

6. The enhanced voucher program is, by definition, a tenant-based program. To the extent that there were individual units in the Oak Grove Towers which could have been occupied by low-income tenants at reduced rents under the terms of the Section 236 mortgage, but which were not occupied by tenants qualifying for enhanced vouchers at the time the project-based subsidies expired, the ability to subsidize the remaining units was lost. In other words, the effect of the termination of the project-based subsidy included the permanent loss of certain low-income housing units. Moreover, if any tenants with enhanced vouchers choose to leave Oak Grove Towers, their units will no longer be available as low-income housing.

7. HUD has indicated that its policy with respect to notice has changed since the events surrounding the Oak Grove Towers project. However, the record does not indicate that the Plaintiff's concerns have been duly addressed by any such change.

885

the Government argues that the question of whether enhanced vouchers should cover rent increases beyond the initial one is not ripe for consideration. The Court disagrees.

First, "[a] plaintiff does not have to 'await consummation of threatened injury' before bringing a declaratory judgment action. . . . Instead an action is ripe for adjudication if the plaintiff faces injury that 'is certainly impending' " *South Dakota Mining Association, Inc. v. Lawrence County,* 155 F.3d 1005, 1008 (8th Cir.1998) (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)) (citations omitted); *see also Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 581–582, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). Although the owners have agreed not to raise the rents again until October 1, 2000, the threat posed is more than an abstract possibility. The past threats to raise the rents beyond what is covered by the enhanced vouchers make it clear that such increases will take place. The increases have thus far been delayed by the earlier settlement agreement in this litigation and, more recently, by the desperate negotiations of the Plaintiff tenants; but these stopgap measures cannot hold forever and when they eventually give way, the Oak Grove Towers tenants will face an immediate crisis.

In determining the question of ripeness, the Court must also consider "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Where, as here, the issues presented to the Court are purely legal, and thus further factual developments are not likely to clarify the controversy between the parties, the question of ripeness is less salient. *See Thomas,* 473 U.S. at 581, 105 S.Ct. 3325.

With respect to the issue of hardship, there is no question that the Court dismissing this matter now as unripe would visit tremendous hardship, both on these Plaintiffs and upon the public at large. First, the Plaintiff tenants are living under an oppressive cloud of uncertainty, with the threat of possible homelessness looming upon the horizon. *See id.* (continuing uncertainty of parties is a consideration for ripeness). While the Government is correct that no decision of this Court can eliminate the uncertainty of these tenants' housing situation, the Court's decision on this matter can go a long way to reducing that uncertainty. Moreover, this uncertainty plagues not just these tenants, but similarly-situated tenants across the country. *See id.* (industry-wide concerns for certainty and clarification can weigh in favor of justiciability of a particular controversy); *see also* Memorandum of Amicus Curiae National Alliance of HUD Tenants, Inc., in Support of Plaintiffs' Motion for Partial Summary Judgment and supporting documentation (discussing the wide class of individuals currently being affected by HUD's interpretation of the enhanced voucher program). Finally, the Court notes that dismissing the matter now—with the high probability that these same Plaintiffs will be compelled to refile within a year—would constitute a monumental waste of resources, both of the Court and the parties. The Court concludes that this matter is ripe for consideration.

At a minimum, the Government urges the Court to defer consideration of the enhanced voucher issue until Congress has acted upon the legislation which will determine whether the program will be renewed or not. Specifically, the Government notes that if Congress declines to renew the program, this debate will be rendered moot. Moreover, the Government argues that Congress may clarify the language of the statute and thereby eliminate the controversy; indeed, the Plaintiffs have provided the Court with a report of the House Committee on Appropriations regarding the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Bill,

2000, which indicates that Congress is aware of the issue of the provision's interpretation and may make its intent explicit.[8] Because this issue is one of great public importance, the Government argues, the Court should defer judgment until Congress "speaks." The Court agrees that this issue is one of great public importance. However, the Court further recognizes that this issue is one of great personal importance to the tenants of the Oak Grove Towers facility and, as such, requires immediate attention. The Court is unwilling to allow the Plaintiff tenants to continue living in a state of dire uncertainty for longer than absolutely necessary to give the issues thorough and considered review.

### 3. Adequate Notice

■ The Plaintiffs have alleged that HUD failed to abide by the requirements of 42 U.S.C. § 1437f(c)(9) when it sanctioned the owners' notice to the Oak Grove tenants and failed to use the deficiency in notice to prevent termination of the project-based subsidies. Specifically, the owners failed to notify the tenants that they intended to refuse any HAP contract renewal until June of 1997; before June of 1997, the tenants had only received notice of the possible non-renewal *by HUD* of one of the HAP contracts. Moreover, the owners failed to provide HUD with the requisite one-year notice of their intent to refuse renewal of the HAP contracts.

At the time these project-based subsidies were terminated, the relevant statutory language read:

Not less than 1 year prior to terminating any contract under which assistance

payments are received under this section ... an owner shall provide written notice to the Secretary [of Housing and Urban Development] and the tenants involved of the proposed termination, *specifying the reasons for the termination* with sufficient detail to enable the Secretary to evaluate whether the termination is lawful and whether there are additional actions that can be taken by the Secretary to avoid the termination.

42 U.S.C. § 1437f(c)(9) (emphasis added).

■ The Government argues that the tenants had notice that their position was precarious, that "something was afoot," and that such notice should be legally sufficient.[9] The Court cannot accept the Government's contention that notice that "something was afoot" was functionally equivalent to notice that the owners of Oak Grove Towers had made a firm decision to prepay their HUD mortgage and allow the HAP contracts to lapse. The clear language of the statute requires the owners to specify the reasons for termination in the notice given. The tenants had notice of only one eventuality which could affect their subsidies: the government's determination not to extend the project-based subsidy. Had the government decided to eliminate the project-based funding contracts, there is little the tenants could have done. Had the tenants had notice that the *owners* were *definitely* terminating the contracts and prepaying the mortgage, however, there are steps the tenants could have taken to preserve the status quo. A person living in Minnesota has notice that there is always the possibility for severe

---

8. The Report discusses the enhanced voucher program: "When this language [creating the enhanced voucher program] was included, the Committee intended that it cover initial rent increases, as well as subsequent rent increases, where the rent is reasonable according to the public housing authority. The Administration, however, has chosen to interpret the law to cover only one rent increase rather than subsequent increases. To clarify any ambiguity, language is included in the Administrative provisions to ensure that sub-

sequent rent increases, if reasonable, are covered by the enhanced voucher."

9. The Court notes that its review of HUD's implementation of legislation within its purview is limited; the Court may only strike down HUD's implementation if it is arbitrary, capricious, or contrary to the plain meaning of the statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

weather; such notice is not functionally equivalent to notice that a tornado has been sighted just down the road.

In short, the Court cannot conclude that the statutory notice requirement was intended as a measure of courtesy to HUD tenants; rather, it was clearly intended to provide tenants affected by a change in their subsidy status an opportunity to *do something* to prevent that change. For those purposes, the Oak Grove Towers tenants did not have adequate notice.

 Moreover, even if the Court were to determine that the statute requires only general notice of a possible cessation in project-based subsidies to the tenants, the statute also requires the owners to provide *HUD* with one-year notice of the specific reasons for termination. HUD's failure to enforce that requirement allowed the owners to avoid renewal of the HAP contracts in the fall of 1997 and thus deprived the tenants of time to find a suitable buyer for the facility or, at a minimum, to seek and secure other suitable housing. While the statute requires notice to HUD, it does so to protect the interests of the tenants by giving HUD an opportunity—and a mandate—to negotiate with landlords and to seek to prevent termination of the contracts. The notice requirement, then, was not something HUD could, in its discretion, waive.

### 4. Enhanced Vouchers

In a notice entitled "PIH 98–19" ("the Policy Statement"), HUD expressed its interpretation of the enhanced voucher program established by Public Law 104–204. Specifically, HUD indicated that it would calculate the amount of enhanced vouchers for qualifying families based upon a rent increase experienced within one year of the termination of project-based funding; any subsequent rent increases would be the responsibility of the tenants. The Plaintiffs argue that this interpretation is a direct violation of the statutory requirements of P.L. 104–204 (authorizing the enhanced voucher program) and P.L. 105–276 (reauthorizing the enhanced voucher

program). Moreover, they argue that, to the extent that the statutory requirements are ambiguous and require interpretation, HUD has violated the Fair Housing Act, 42 U.S.C. §§ 3604 and 3608, by failing to consider the effects of its interpretation on racial minorities and the disabled and by failing to administer its programs in such a way as to affirmatively further fair housing.

The pertinent portions of the statute read:

> *Provided further,* That notwithstanding any other provision of law, subject to the availability of appropriated funds, each low-income family, and moderate income family who is elderly or disabled or is residing in a low-vacancy area, residing in the housing on the date of prepayment or voluntary termination, and whose rent, as a result of a rent increase occurring no later than one year after the date of the prepayment, exceeds 30 percent of adjusted income, shall be offered tenant-based assistance in accordance with section 8 or any successor program under which the family shall pay no less for rent than it paid on such date: *Provided further,* That any family receiving tenant-based assistance under the preceding proviso may elect (1) to remain in the unit of the housing and if the rent exceeds the fair market rent or payment standard, as applicable, the rent shall be deemed to be the applicable standard, so long as the administering public housing agency finds that the rent is reasonable in comparison with rents charged for comparable unassisted housing units in the market or (2) to move from the housing and the rent will be subject to the fair market rent of the payment standard, as applicable, under existing program rules and procedures.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997, P.L. 104–204, 110 Stat. 2874, 2884–85 (1997). Thus, under the terms of the statute, when project-based subsidies are ter-

minated, a qualifying family may choose to remain in their home and receive a voucher for any rent which is "reasonable" according to the public housing agency. If the family chooses instead to move, the amount of the voucher is based upon a payment standard rather than upon any reasonable actual rent; because the payment standards are calculated regionally, they may be significantly lower than any actually available rents in a given community. In short, for families which choose to remain in their homes, the amount of the vouchers is "enhanced."

The heart of this controversy is the language which states that "the rent shall be deemed to be the applicable standard" for calculating the amount of the enhanced voucher. According to HUD's Policy Statement, the qualifying language, "whose rent, as a result of a rent increase occurring no later than one year after the date of the prepayment, exceeds 30 percent of adjusted income," modifies or defines the term "rent" for purposes of evaluating the applicable standard. In other words, the enhanced voucher is calculated based upon the rent, as increased during the first year following project-based subsidy termination, but then remains static in the face of any further increases.

 The Court must defer to an agency's interpretation of a program within its administrative purview, unless the agency's interpretation is irrational, arbitrary, capricious, or in conflict with the plain language of the statute. See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Government argues that the Policy Statement is a legitimate interpretation of the enhanced voucher program which, because of the deference owed HUD in this context, the Court cannot disturb. The Court disagrees.

The Court finds, instead, that HUD's Policy Statement violates the plain meaning of the statutory language. Specifically, HUD's Policy Statement relies upon a tortured definition of "rent" which cannot be

rationalized in the context of the rest of the statutory language. First, as the Plaintiffs note, the statute states that "the rent shall be deemed to be the applicable standard, *so long as* the administering public housing agency finds that the rent is reasonable." 110 Stat. At 2885 (emphasis added). ʹThe durational language indicates that the "rent" at issue is a dynamic entity, the reasonableness of which must be continually reassessed through time. Moreover, in defining the second option given to voucher tenants, to move and to take the voucher with them, the legislation states that "the rent will be subject to the fair market rent of the payment standard." Here the term "rent" is used generically, as it is in the description of the enhanced vouchers, and here the term rent cannot logically be related to the "original rent plus any increase occurring within the first year after termination." The Government would have the Court believe that the reference to an increase in the first year following termination defines "rent" for purposes of the rest of the statute; that clearly is not the case.

Instead, a straightforward reading of the plain meaning of the statute indicates that the reference to an increase in rent during the first post-termination year is relevant only to defining the individuals who qualify for the enhanced voucher program, not to defining "rent" as having some meaning other than the usual. Rent simply means rent—the amount of money charged by a landlord in exchange for the occupancy of a tenant.

The Government has expressed concern that the interpretation of the statute urged by the Plaintiffs, the only interpretation that this Court finds to be supported by the statutory language, will create a limitless obligation on the part of HUD to pay exorbitant subsidies to low-income tenants. However, the durational language noted above—"so long as"—sets a limit on HUD's obligations: the enhanced vouchers provided by HUD will support the effort of low-income families to remain in their

homes *so long as* the rents are reasonable. The statute does not provide landlords and tenants *carte blanche* to take advantage of the enhanced voucher program.

The Court concludes that the HUD policy articulated in PIH 98–19 violates the express language of P.L. 104–204. Therefore, the Court need not reach the question of whether HUD has violated the Fair Housing Act with respect to its interpretation of the statutory provisions. However, HUD has recognized that a disproportionate number of low-income tenants are minority, elderly, or disabled. Aff. of John Cann, Exhibits A and B (HUD position papers on the lack of availability of low-income housing). Thus the Court recognizes that HUD's interpretation of the enhanced voucher program will certainly have a disproportionate effect on minority, disabled, and elderly tenants.

Moreover, minority, elderly, and disabled tenants face significant hurdles in locating housing above and beyond the mere shortage of low-income housing. Despite the nominal protection of federal laws, minority tenants continue to experience discrimination by landlords and hostility from non-integrated communities. Elderly and disabled tenants are restricted to housing which accommodates their physical limitations; the pool of housing which is both affordable and accessible is small indeed. Any policy which results in the displacement of low-income tenants will disproportionately affect these particular low-income citizens whose housing options are especially constrained.

While the Court does not reach the extent of HUD's legal obligation under the Fair Housing Act, the Court cannot ignore the impact of HUD's policy on minority, disabled, and elderly tenants. In light of the general crisis in availability of housing and the more-acute specific crisis of these disadvantaged demographic groups, HUD's strained interpretation of the enhanced voucher legislation is particularly unacceptable.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. No. 38) is **DENIED**;

2. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 32) is **GRANTED** and declaratory judgment entered as follows:

a. The statutory authority under which HUD has issued "enhanced" vouchers to residents of Oak Grove Towers apartments requires that any rent charged to tenant-recipients of enhanced vouchers which the Minneapolis Public Housing agency finds to be reasonable must be deemed to be the applicable voucher payment standard and the provisions of HUD Notice PIH 98–19, paragraph 11.B. to the contrary violate the plain language of the law; and

b. HUD's approval of the owners' termination of the project-based Section 8 contracts at Oak Grove Towers was contrary to the requirements of 42 U.S.C. § 1437f(c)(9) and was therefore not in accordance with the law.