In re ADELPHIA COMMUNICATIONS
CORP., et al., Debtors.

The Bank of New York,
et al., Plaintiffs,

v.

Adelphia Communications Corp.,
et al., Defendants.

Bankruptcy No. 02–41729–REG.
Adversary No. 03–93825 (REG).

United States Bankruptcy Court,
S.D. New York.

April 12, 2004.

Stroock & Stroock & Lavan LLP by Michael J. Sage (argued), Curtis C. Mechling, Daniel A. Ross, Gerald C. Bender, New York, NY, for plaintiff Ad Hoc Committee of Subordinated Noteholders.

Dechert LLP, by Glenn E. Siegel, Charles I. Poret (argued), New York, NY, for plaintiff The Bank of New York, as Indenture Trustee for Subordinated Notes.

Willkie, Farr & Gallagher LLP by Myron Trepper, Marc Abrams (argued), Roger Netzer, New York, NY, for defendant Debtors.

Seward & Kissel LLP by Bruce G. Paulsen (argued), Arlene R. Alves, New York, NY, for intervenor defendant Law Debenture Trust Company of New York as Indenture Trustee for the Senior Debt.

Kasowitz, Benson, Torres & Friedman, LLP by David M. Friedman (argued), Adam L. Shiff, Andrew K. Glenn, New York, NY, for intervenor Official Committee of Unsecured Creditors.

Bragar, Wexler, Eagel & Morgenstern, LLP by Mark R. Jacobs, New York, NY, for the Official Committee of Equity Security Holders.

Haynes and Boone, LLP by Robin E. Phelan, Debra J. McComas, Dallas, TX, for Bank of America.

Simpson, Thacher & Bartlett, LLP by William T. Russell, Jr., New York, NY, for Wachovia Bank, N.A.

Chadbourne & Parke, LLP by Andrew P. Brozman, New York, NY, for Credit Lyonnais.

Kirkland & Ellis LLP by Edward O. Sassower, New York, NY, for Ad Hoc Committee of Non–Agent Secured Lenders.

Andrews & Kurth, LLP by Justin Wyatt, New York, NY, for Ad Hoc Committee of Preferred Shareholders.

Dilworth Paxson, LLP by Lawrence G. McMichael, Philadelphia, PA, for the Rigas Family.

*DECISION ON MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION*

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of a case under chapter 11 of the Bankruptcy Code, holders of approximately $665 million principal amount[1] of the subordinated debt ("Sub Debt") issued by debtor Adelphia Communications Corporation (joined by the Sub Debt indenture trustee) seek a declaratory judgment with respect to the construction of the "X Clause" in the indenture covering their notes (the "Sub Debt Indenture"),[2] as ap-

---

1. *See* Arg. Tr. 51. Their collective holdings, which "change almost every day," *id.* (presumably because of trading in Adelphia debt), appear to have increased since the time the adversary proceeding was filed. Compare Cmplt. (ECF # 3) ¶ 24.

2. The purpose and effect of an "X Clause," as a general matter, was explained by Judge Posner of the Seventh Circuit in *In re Enviro-*

*dyne Industries, Inc.,* 29 F.3d 301 (7th Cir. 1994) (*"Envirodyne"*) (holding, upon objections to confirmation of a chapter 11 plan, that under the "X Clause" language there, holders of subordinated debt were not entitled to share *pari passu* with senior debt, even though the plan made the distributions in common stock):

The class of clause to which the parenthetical clause in this indenture belongs

plied to a scenario under which Adelphia and the other debtors in this case ("Debtors") would issue stock of the reorganized debtors under a confirmed reorganization plan. The action seeks a pre-confirmation ruling from this Court on what is in substance an intercreditor dispute, between holders of the senior bond debt ("Senior Debt") and the Sub Debt.[3] The Sub Debt holders seek a ruling as to whether the Sub Debt Indenture's general rule—providing for Sub Debt to pay over to Senior Debt distributions from the Debtors on such debt—is inapplicable when the currency by which plan distributions are made is stock, rather than cash or debt securities.

The Sub Debt holders (joined by the Sub Debt Indenture Trustee) moved for summary judgment in their favor on this issue, and the Debtors (joined by the Senior Debt Indenture Trustee) cross-moved for summary judgment in their favor. But presenting an important threshold issue, the Creditors' Committee (and, shortly thereafter, the Senior Debt Indenture Trustee) also moved to dismiss this adversary proceeding, for lack of subject matter jurisdiction, asserting that it fails to meet the "case or controversy" and ripeness requirements for any action in the federal courts, and similar requirements for obtaining a declaratory judgment, by reason of the early stage at which the issue has been presented and the many circumstances that could change the nature of the controversy or make it academic.

Upon consideration of the matter, the Court agrees with the Creditors' Committee and the Senior Debt Indenture Trustee that this adversary proceeding fails to satisfy applicable "case or controversy" and ripeness requirements, and thus dismisses this adversary proceeding for lack of sub-

---

goes by the unilluminating name of "X Clause." Such clauses are common in bond debentures, although there is no standard wording. Without the clause, the subordination agreement that it qualifies would require the junior creditors to turn over to the senior creditors any securities that they had received as a distribution in the reorganization, unless the senior creditors had been paid in full. Then, presumably, if the senior creditors obtained full payment by liquidating some of the securities that had been turned over, the remaining securities would be turned back over to the junior creditors. The X Clause shortcuts this cumbersome procedure and enhances the marketability of the securities received by the junior creditors, since their right to possess (as distinct from pocket the proceeds of) the securities is uninterrupted.

*Id.* at 306 (citations omitted). But whether that was the purpose and effect of the X Clause here—and, more importantly, whether subordination is required here, as it was held to be required in *Envirodyne*—is the matter to be decided in this case, and is sharply disputed. For the reasons set forth below, the Court believes that the merits of the underlying dispute cannot appropriately be determined at this time.

3. The adversary proceeding was originally brought against the Debtors, whose proposed plan has been premised in part on the assumption that subordination in favor of the Senior Debt is required, and in their papers and oral argument, the Debtors have sided with the Senior Debt. After the adversary proceeding was commenced, the Senior Notes Indenture Trustee intervened on behalf of holders of Senior Debt. The Official Committee of Unsecured Creditors (which represents unsecured debt of diverse types and levels of priority) also intervened in this adversary proceeding; it ultimately sided with the Senior Debt as to the merits, in material part because of its view that acceptance of the Sub Debt's position could impede the confirmation of a reorganization plan in this case.

Though it is only modestly relevant to the controversy, the Court notes that, at least collectively, the holders of the Sub Debt who are plaintiffs in this adversary proceeding hold an even larger principal amount of Senior Debt. *See* Arg. Tr. 51.

ject matter jurisdiction.[4]

*Facts*

The facts relevant to the two dismissal motions are not so much those relating to the merits of the underlying dispute. They are rather those relating to the context in which this Court is asked to consider the merits.

In recent months, the Debtors and other parties in interest in this case have increasingly focused on possible plans of reorganization by which the Debtors might emerge from chapter 11. With respect to any possible plan of reorganization, there is, to say the least, a wide divergence of views. Some stakeholders assert that the interests of the estate would be best served by reorganizing the Debtors as an independent stand-alone entity, with stakeholders sharing in the value of the reorganized entity, in order of their levels of priority, down to the asserted value of enterprise, and wiping out those who would be "out of the money." Other stakeholders assert that the interests of the estate would be best served by a reorganization plan that embodies a sale of the Debtors' business—testing the market, and also, at least assertedly, determining with greater precision the estate's enterprise value. Others urge different views still. And others wish to address additional concerns (or have views informed by such concerns), such as the multi-billion dollar lawsuit brought by the Creditors' Committee and the Debtors against some of the Debtors' pre-petition lenders and investment banks, with respect to loans to the Debtors and the Rigases under "co-borrowing" arrangements, which asserted-

ly subjected the Adelphia estate to billions of dollars of additional liabilities without corresponding value to the estate.

Starting at some point at the end of 2003, the Debtors signaled to their stakeholders that they were likely to propose a standalone reorganization plan, based upon an assumed enterprise value that, if implemented, would leave the stakeholders at the lower priority levels—common stock, preferred stock, and, possibly, Sub Debt, out of the money. But with different, higher, enterprise values, one or more of those constituencies could secure meaningful recoveries from the estate, and, not surprisingly, there has been vigorous debate with respect to the estate's real enterprise value. The Debtors either expressly or impliedly stated that the currency by which much of their plan distributions to creditors would be made was common stock, and the Debtors either expressly or impliedly stated that they agreed with holders of Senior Debt that under the Sub Debt Indenture as drafted, no distributions—even of stock—could be made to Sub Debt unless and until Senior Debt was paid in full, and that any reorganization plan proposed by the Debtors would be faithful to that principle.

Based on understandings premised upon such express or implied statements, the Sub Debt holders brought this adversary proceeding for a declaratory judgment, even before the Debtors filed a proposed reorganization plan. While motion papers were going back and forth—with respect to both the merits and the two motions to dismiss—the Debtors filed a proposed re-

---

4. This Court's ruling, which is not on the merits, is without prejudice to any rights the Sub Debt has vis-à-vis the merits. It is likewise without prejudice to the rights of the Sub Debt to raise these issues in an objection to confirmation of any reorganization plan, or by a renewed adversary proceeding at or near the time for confirmation, if the plan then before the Court has the same argued infirmities. At such time, in this Court's view, the Sub Debt's issues likely would then meet "case or controversy" and ripeness requirements.

organization plan, along with a draft disclosure statement, which, as the Sub Debt holders had anticipated, enforced subordination when making distributions in the currency of common stock. But the reaction to the Debtors' proposed plan has been mixed, with many parties in interest expressing displeasure with it. And several parties have moved to end the Debtor's plan exclusivity, at the same time the Debtors have moved to extend it, with extensive hearings on those matters now scheduled for April 26 and 28, 2004.

When the Creditors' Committee first moved to dismiss this adversary proceeding on "case or controversy" and ripeness grounds, the Debtors' plan had not even been proposed, and now, of course, it has been. And it is very much the type of plan that the Sub Debt holders feared, and that they contend is violative of the requirements of the Sub Debt Indenture. But many other uncertainties with respect to what will or may happen next in this case remain. They include, at the least:

- whether the Debtors will continue to propose this plan;
- whether this plan will secure acceptances by the requisite number of creditors;
- whether the Debtors' plan will be amended in a way which addresses the Sub Debt holders' concerns;
- whether any Debtors' plan will make distributions in a currency other than stock;
- whether the Debtors' enterprise valuation, as ultimately found by this Court, will be higher than that now assumed by the Debtors, thereby making a denial of a recovery to the Sub Debt

holders violative of the Sub Debt Indenture even if the construction of the Sub Debt Indenture urged by the Sub Debt holders is ultimately rejected by the Court;

- whether, as a consequence of any valuation ruling by this Court, the Debtors revise their plan to make the value allocations that would be consistent with a higher enterprise value, which might include stock to the Sub Debt of a value sufficient to make their concerns moot;
- whether exclusivity will be lifted and another constituency will propose a plan;
- if so, whether the other constituency will likewise propose a plan by which distributions are made in stock; and
- whether, as some constituencies have urged, any plan will provide for a sale of the company, giving rise to a pot of cash with respect to whose distribution the "X Clause" would be inapplicable.

Put another way, even assuming, *arguendo*, that this Court decided the issues the Sub Debt holders want this Court now to consider, and decided them in the Sub Debt's favor, there are a multitude of scenarios under which all of this would have turned out to be an idle exercise, or the wrong exercise, because later factual developments changed or eliminated the issues to be decided.

*Discussion*

*I.*

■ The United States Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies." [5] Similarly, under the Federal Declaratory Judg-

---

5. U.S. Const. art III, § 2, cl. 1; *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 238–239, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (*"Aetna Life"*). Although bankruptcy courts are not Article III courts, they are subject to the jurisdictional

constraints of Article III to the extent that they exercise the judicial power of the United States. *See, e.g., In re Trans World Airlines, Inc.,* 169 B.R. 91, 93–94 (Bankr.D.Del.1994) (Balick, J.) (*"TWA"*).

ments Act, Congress has authorized declaratory judgments only "[i]n ... case[s] of actual controversy."[6] For a court to have subject matter jurisdiction over a declaratory judgment action, there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[7]

■ Additionally, as noted in *Dow Jones & Co., Inc. v. Harrods, Ltd.*,[8] in this district, "the Supreme Court has stressed not only that the controversy must be sufficiently real and immediate, allowing specific and conclusive relief, but that it must also be ripe for adjudication."[9] In *Wycoff*, as the *Dow Jones* court observed, the Supreme Court instructed that "[t]he disagreement must not be nebulous or contin-gent but must have taken a fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on its adversaries, and some useful purpose to be achieved in deciding them."[10]

■ As further noted in *Dow Jones*, the Second Circuit, in *Muller v. Olin Mathieson Chem. Corp.*,[11] reaffirmed that "the measure of an actual controversy is necessarily relative, and demands corresponding flexibility; [the Second Circuit] instructed that '[t]he difference between definite, concrete and substantial controversies which are justiciable, and hypothetical, abstract, or academic ones which are not justiciable, is one of degree, to be determined on a case by case basis.'"[12] Accordingly, the *Dow Jones* court noted:

**6.** *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993) (*"Olin Corp."*), *quoting* 28 U.S.C. § 2201. With exceptions not relevant here, that section provides, in pertinent part:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The Declaratory Judgment Act was drafted with the constitutional provision in mind, and "is operative only in respect to controversies which are such in the constitutional sense.... Thus the operation of the Declaratory Judgment Act is procedural only." *Aetna Life*, 300 U.S. at 240–241, 57 S.Ct. 461. It provides no independent basis for subject matter jurisdiction. *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d. Cir. 1996) (*"Niagara Mohawk"*). Since the "actual controversies" requirement of the Declaratory Judgment Act "incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution," *id.*, declaratory judgment cases are helpful in analyzing the Article III issues here.

**7.** *Maryland Casualty Co. v. Pacific Coal Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Olin Corp.*, 5 F.3d at 17 (quoting *Maryland Casualty*). That this adversary proceeding involves a "substantial controversy" is undisputed. The other two requirements, "between parties having adverse legal interests," and "of sufficient immediacy and reality"—what this Court refers to as the "disputed *Maryland Casualty* requirements," even though many cases have now held similarly—are the subject of sharp debate here.

**8.** 237 F.Supp.2d 394 (S.D.N.Y.2002) (Marrero, J.) (*"Dow Jones"*).

**9.** *Id.* at 406–407, explaining and quoting from *Public Service Commission of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952) (*"Wycoff"*).

**10.** *Id.* (quoting *Wycoff*, 344 U.S. at 244, 73 S.Ct. 236).

**11.** 404 F.2d 501, 504 (2d Cir.1968).

**12.** *Dow Jones*, 237 F.Supp.2d at 406 & n. 38, citing *Muller*, 404 F.2d at 504, which in turn had cited *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. 510.

[A] touchstone to guide the probe for sufficient immediacy and reality is whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass.[13]

In making that observation, the *Dow Jones* court drew upon the Supreme Court's decision in *Thomas v. Union Carbide Agric. Prod. Co.*,[14] properly reading *Union Carbide* as teaching that:

[C]entral to the ripeness requirement is that courts should not endeavor to resolve contingencies that may or may not occur as expected or may not happen at all.[15]

## II.

█ The Court assumes, without deciding, that after the intervention of the Senior Debt, the parties have sufficiently adverse legal interests,[16] thereby satisfying the first of the *Maryland Casualty* requirements. But the second *Maryland Casualty* requirement—that the dispute have "sufficient immediacy and reality"—remains a matter of concern. And the additional requirement of ripeness is an even greater matter of concern. This Court must decide whether a construction of the Sub Debt Indenture with respect to the Debtor's proposed plan, which if confirmed would prejudice the Sub Debt, meets the requirements for a justiciable case or controversy, given the many uncertainties as to whether the adverse consequences the Sub Debt fears "may or may not occur as expected or may not happen at all." [17]

When examined by the standards imposed by the Supreme Court and Second Circuit, the controversy here is too contingent and speculative to meet Article III requirements. The reorganization plan recently filed by the Debtors is, as its counsel properly described it, a proposal to its stakeholders, which they may or may not find to their liking. Assertions in recent filings with this Court suggest that many do not. Indeed, a fair number of stake-

---

13. 237 F.Supp.2d at 406–407 & n. 39.

14. 473 U.S. 568, 580–581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).

15. 237 F.Supp.2d at 407 n. 39, citing *Union Carbide,* 473 U.S. at 580–581, 105 S.Ct. 3325 (parentheses omitted) ("Monsanto's claim thus involved 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" quoting 13 A C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 3532 (1984)).

16. Some authority has considered the presence of a contingency to be relevant to the "adverse interests" requirement. *See Armstrong World Industries, Inc. v. Adams,* 961 F.2d 405, 411 (3d Cir.1992) ("[w]here the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III"); *TWA,* 169 B.R. at 94 ("a party's interest is not likely to be adverse where the action is based on a contingency"). These cases add the presence of a contingency to "adverse legal interests" analysis that might start with whether the issues are sufficiently adverse in a substantive sense (*e.g.,* legal positions at odds with each other, *see Niagara Mohawk,* 94 F.3d at 752–753), and are likely to be vigorously opposed. However, since considering the significance of a contingency does not go so much to issue adversity or to the adequacy of the advocacy for the two sides of the dispute, and in any event overlaps in concept with the "sufficient immediacy and reality" requirement and ripeness concerns, the Court prefers to consider the presence of contingencies in connection with whether the issues to be decided have sufficient immediacy and reality, and are ripe for determination.

17. *Dow Jones,* 237 F.Supp.2d at 407 n. 39.

holders favor an end to exclusivity, so that one or more alternative plans might be presented for consideration, and, perhaps, confirmation. It is at least possible, and perhaps likely, that if the Debtors' plan exclusivity is continued, they will nevertheless amend the plan, and it is at least possible that plan amendments would change the nature of the controversy to be decided by the Court, or even make it go away. A change in plan currency—debt instead of stock—could have such an effect, as could a decision to market Adelphia, as several constituencies urge, rather than proceeding with a standalone plan. Countless other plan amendments might also cause changes in the shape of the controversy, or make it moot. It is also at least possible that if the Debtors' enterprise value turns out to be greater than the Debtors now think it is, the enterprise value would be sufficient to put Sub Debt "in the money," or partly so, once again changing the nature of the controversy, or making it moot. At this juncture, all or substantially all of the uncertainties noted at page eight above exist, and all or substantially all of them could have a material effect on the nature of the controversy, or even make it go away.

These uncertainties, particularly in the aggregate, make this dispute inappropriate for determination at this time. All parties agree that the concerns voiced by the Sub Debt holders would be a sound basis for an objection to confirmation, and, if upheld by the Court, would bar confirmation.[18] But consideration of confirmation comes at a markedly later time in the process, when all or substantially all of the contingencies described above would have sorted themselves out. If the Debtors keep exclusivity, and if they do not amend this plan, and if they push it forward for confirmation, and if it secures the necessary votes, and if it then comes up for confirmation, the same Sub Debt holders' concerns can be addressed, as an objection to confirmation, at which time the issues then can appropriately be decided.[19] Likewise, if, as is possible and perhaps likely, a different plan is proposed for confirmation, Sub Debt holders' concerns, if any, can be addressed in the context of the facts as they exist at that time.

Authorities relied upon by the Sub Debt holders do not lead the Court to a contrary result. The Declaratory Judgment Act, 28 U.S.C. § 2201, as noted above,[20] was drafted with Article III's requirements in mind, and "is operative only in respect to controversies which are such in the constitutional sense. . . . Thus the operation of the Declaratory Judgment Act is procedural only."[21] It provides no independent basis for subject matter juris-

---

**18.** That, along with the fitness of the issues for judicial consideration, is relevant to the ripeness determination. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (an element of the ripeness analysis is "the hardship to the parties of withholding court consideration"). Here, withholding consideration now would not deny Sub Debt holders the opportunity to have their contentions fully and fairly considered.

**19.** *See In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1145–1146 (2d Cir.1993)

(holding that there was "simply no justiciable issue . . . to resolve," and that doctrine of ripeness prevented consideration of objections to contemplated distribution of SEC Disgorgement Fund, when plan of distribution for the fund had not yet been presented, and the district court had issued no order approving the distribution of the fund for the court of appeals to review).

**20.** *See* n. 6, *supra.*

**21.** *Aetna Life,* 300 U.S. at 240–41, 57 S.Ct. 461.

diction.[22] Likewise, Fed.R.Bankr.P. 7001 (assuming, *arguendo*, that it applies to a request for a declaratory judgment of this nature) is a *procedural* rule requiring disputes of certain types to be addressed in adversary proceedings (with their greater degree of formality), rather than in contested matters. But like the Declaratory Judgment Act (which at least is a statute, and not merely a rule), Rule 7001 cannot confer subject matter jurisdiction on the Court—which is a substantive matter—if this Court does not otherwise have it. The ripeness issue in *Kings Falls Power*, which determined, in part, subordination issues with respect to rights to proceeds under a ground lease to which the Debtor was a party, turned on whether the debtor needed first to assume the lease before the Court could decide the controversy.[23] While it is true, as the Sub Debt holders argue,[24] that the declaratory judgment request there came up before the filing of a plan and disclosure statement (and its determination would help terminate uncertainty as to the debtor's ability to reorga-

nize),[25] it did not involve an issue under a proposed reorganization plan, and it did not require the *Kings Falls Power* court to decide the ` controversy under circumstances that could later materially change the nature of the controversy, or make it go away.

The Court understands, and is sympathetic to, the points made by the Sub Debt holders that an early ruling might facilitate their negotiations; that they would know better what litigation positions they might wish to take if they knew what the outcome would be in this controversy;[26] and that efforts on the part of the Debtors to confirm what would turn out to be an unconfirmable plan would be time consuming and costly. But these points do not confer subject matter jurisdiction where it is lacking, and in any event prove too much. Because as the Creditors' Committee fairly argues, "[w]ere such an argument to carry the day, bankruptcy courts would be beset with requests for numerous advisory opinions, many of which ultimate-

---

**22.** *Niagara Mohawk*, 94 F.3d at 752; *see also Fourth Branch Assoc. v. Mohawk Paper Mills, Inc. (In re Kings Falls Power Corp.)*, 185 B.R. 431, 436 (Bankr.N.D.N.Y.1995) (Gerling, C.J.) (*"Kings Falls Power"*) ("[a] bankruptcy court's discretion to issue declaratory judgments is subject to the constraints of the Act and the court's jurisdictional limits").

**23.** *See Kings Falls Power*, 185 B.R. at 436 ("Mohawk contends that 'until the Ground Lease is assumed and future obligations, rights, and remedies under the Ground Lease become an issue, there is no actual and present controversy for this Court to decide'"); *id.* at 437 ("The Court is unpersuaded by Mohawk's argument that until the Ground Lease is formally assumed, it does not constitute an enforceable contractual agreement and thus an actual controversy does not exist").

**24.** Sub Debt Holders' Response (ECF # 30) at 12.

**25.** *See Kings Falls Power*, 185 B.R. at 437.

**26.** Counsel for the Sub Debt holders stated, with refreshing candor:

> The harm is that we are left in an untenable, ridiculous position of not knowing how to take any other position in the case. We don't know what to do because we don't know whether we're *pari passu* creditors, whether we're subordinated creditors, we don't know whether we're senior or junior. We don't know where we stand on certain issues.
>
> We can take a position on things and sort of cover every base, try to cover, you know, all angles. But that's not easy to do because our views may change and may be very different if we are *pari passu*, they may be very different if we're junior. And it puts us in a very difficult and untenable position not to know where we stand in this case, Your Honor.
> Arg. Tr. 55.

ly would have no practical application."[27]

The Court likewise understands, and is sympathetic to, the concerns voiced by the Sub Debt holders that if their objections had to wait until confirmation, and this Court then ruled against them and confirmed a plan over their objection, mootness arguments by plan proponents might thwart Sub Debt holders' opportunities for appellate review. And this Court does not want to subject Sub Debt holders to such a "Catch-22" situation any more than they want to be bound up in one. But the Creditors' Committee noted, without objection or disagreement, that in a case of this complexity, it is hardly clear that any confirmed plan could become effective so quickly that appellate review would be thwarted;[28] an appellate court might not

agree that it is foreclosed from considering the merits by reason of mootness concerns;[29] and, most importantly, this Court cannot conclude that these concerns— while they do indeed appeal to this Court's sense of fairness—are sufficient to trump the more fundamental "case or controversy" and ripeness principles under which this or any other federal court must operate.

Thus, upon consideration of the caselaw in this area, this Court concludes that the requirements for establishing the required "case or controversy," and the related requirement of ripeness, have not been satisfied. While the Court fully understands the monetary consequences, to the creditor groups concerned, of a decision on the merits, and the Sub Debt's preference that

---

**27.** Creditors' Committee Reply (ECF # 45) at 2. It also is true, as the Creditors' Committee argued in its initial brief (ECF # 10, at 13), that if plan confirmation issues could be considered in such piecemeal fashion, the plan process would be subject to great risk of disruption, particularly if appeals were taken and this Court was deprived of jurisdiction, in whole or in part, to address critical plan confirmation matters while appeals were underway. These would be matters of great concern to this Court if this Court were deciding whether to decide this controversy as a matter of its discretion, but are not critical to this decision, as it is fundamentally grounded on determinations of law.

**28.** Counsel for the Creditors' Committee stated, in relevant part:

I just want to spend a couple of minutes on the issue of equitable mootness, which I think is an awfully difficult issue to address today in the abstract.

If the question is ... how necessary will it be at the time of confirmation of a plan that we don't know yet what its contours will be, how necessary will it be to consummate all of its elements[,] and what will be the consequences of certain elements that are not consummated, the answer is I don't know[,] because I don't know what kind of plan it's going to be[,] and I don't know what requirements will be placed upon

Adelphia to emerge. There could be issues with exit financing. There could be issues with governmental regulat[ors]; there might not be.

I think it's fair to say it's going to take a while. I admit I don't know what that means, "a while," but it's going to take a while to go effective once this company confirms under any plan. It's just very complicated.

And so this is not a case where somebody is going to confirm, ask the Court to waive the requirements of—I think it's 7062, and then the next morning we find out that the egg's been scrambled. It's absolutely not going to happen here. Even if you wanted it to, it couldn't happen, but I don't think it's going to happen.

Hrg. Tr. 73–74 (apparent transcription errors corrected).

**29.** In each of *Envirodyne*, 29 F.3d at 303–304, and *In re PWS Holding Corp.*, 228 F.3d 224, 235–237 (3d Cir.2000), the courts of appeals decided "X Clause" interpretation confirmation objections on the merits, in the face of mootness arguments. However, appellate mootness objections are frequently, if not always, heavily factual, and this Court is not in a position to assume, and does not assume, that higher courts that might ultimately consider a confirmation order in this case would come to a like conclusion.

the issue be decided now, as an aid to the parties' further negotiations and decisions as to litigation positions, the Court cannot decide the merits at this time.[30] The feared consequences remain a mere possibility, "that may or may not occur as expected or may not happen at all." [31]

### Conclusion

The motions to dismiss for lack of subject matter jurisdiction are granted, without prejudice to the rights of the Sub Debt holders as set forth in footnote four above. The Creditors' Committee's alternative request—for a discretionary stay of this action, pending consideration of the issues along with objections to confirmation—is moot.

---

**30.** The Court does not need to decide, and does not decide, whether potential confirmation objections are *never* appropriate for determination in an earlier declaratory judgment action. It rules only that on the facts here, with so many uncertainties present, any one of which could change the issue to be determined or make it go away, the requirements of "case or controversy" and ripeness have not been satisfied.

**31.** *See* n. 17 *supra.*