## In re ELECTRONIC MACHINERY ENTERPRISES, INC.

Hunt Construction Group, Inc.; Clark Construction Group, Inc.; and Construct Two Construction Managers, Inc., Appellants,

v.

Electronic Machinery Enterprises, Inc., Appellee.

No. 8:10–cv–2586–T–23.

United States District Court, M.D. Florida, Tampa Division.

April 20, 2012.

E. Kelly Bittick, Jr., David Hywel Leonard, Sylvia H. Walbolt, Carlton Fields, PA, Tampa, FL, for Appellants.

Christopher T. McRae, David J. Metcalf, McRae & Metcalf, PA, Tallahassee, FL, James S. Myers, McRae & Metcalf, PA, Stacy Delayne Blank, Holland & Knight, LLP, Tampa, FL, for Appellee.

### ORDER

STEVEN D. MERRYDAY, District Judge.

Hunt Construction Group, Inc., The Clark Construction Group, Inc., and Con-

struct Two Construction Managers, Inc., (together, "HCC") appeal (Doc. 21) an April 19, 2010, bankruptcy court judgment (Doc. 1–1) in favor of Electronic Machinery Enterprises, Inc. ("EME"). EME answers (Doc. 27), and HCC replies. (Doc. 30)

## THE BANKRUPTCY JUDGE'S ORDER

The bankruptcy judge's order includes the following findings of fact and conclusions of law:

Orange County, Florida, hired HCC to manage the construction of a 2.8 million square-foot, $500 million concourse and exhibit hall at the Orange County Convention Center. HCC sub-contracted to EME electrical construction worth $13.4 million. From nearly the start and even before HCC hired EME, the project suffered delay and additional expense caused by HCC's shambolic scheduling and organizing of the project's many sub-contractors. Near the end, HCC altogether abandoned the scheduling responsibility. Left in a state of anarchy, sub-contractors scavenged for ready tasks, struggled to share space and equipment, and strained to supervise scattered and itinerating employees. Building out of sequence, different trades ruined each other's work. To prevent sub-contractors' quitting as unforeseen costs mounted, HCC paid subcontractors, including EME, an informal and episodic "allowance" accompanied by a promise that HCC would pay more money later.

HCC manipulated the schedule to hide disorganization and delay; HCC contrived a back-charge against the sub-contractors to create negotiating leverage; HCC encouraged the sub-contractors to submit an inflated storm insurance claim; and, shortly after the project ended, HCC destroyed dumpster-loads of needed records. At-tempting to escape a promise to settle and to pay EME's additional cost, HCC employed these and other evasions, but the evasions failed. After an eight-week trial and the compilation of a 14,000–page record, the bankruptcy judge concludes in a comprehensive, meticulous, and compelling order that HCC must pay EME $6,376,000. (With attorney's fees, interest, and costs the April 19, 2010, judgment totals $15,757,625.21.)

HCC owed EME an explicit contractual duty to maintain a schedule for the project and to coordinate the work of each subcontractor. Although HCC enjoyed a contractual right to "respond to job conditions" and to modify the project's schedule, HCC entirely ceased to coordinate or to schedule, a dereliction that breached the contract between HCC and EME. The record contains EME's sound calculation of damages, produced by a knowledgeable expert. HCC waived a contractual limit on damages by concealing the project's delay when EME signed the contract, by obstructing EME's performance of the contract, and by promising EME more money if EME continued to work.

In each of these findings of fact and conclusions of law, the bankruptcy judge's order accords with both the applicable law and the manifest and clearly convincing weight of the evidence, which includes EME's expert calculation of damages and which emphatically resolves this appeal from the bankruptcy judge's decision on the merits of the parties' dispute. The only mischief arises from a recurring source, the distinction between the core and the non-core jurisdiction of the bankruptcy court.

## THE JURISDICTIONAL ISSUE

In addition to alleging that HCC breached the parties' contract, EME alleges that HCC violated the bankruptcy stay. While

deciding motions to withdraw the reference, the district court earlier held (Doc. 3–9) that the stay dispute is a core proceeding and that the contract dispute is a non-core proceeding. Nevertheless, because some of the contested facts that underlie the stay dispute, which is a core dispute, also underlie the more comprehensive contract dispute, which is a non-core dispute, the bankruptcy judge concludes that resolving the core dispute necessarily includes finding facts that are essential to resolving the non-core dispute. The bankruptcy judge next concludes that principles of collateral estoppel (or, perhaps, even "law of the case") compel the facts determined in the non-core dispute to conform to the earlier, purportedly binding determination of facts in the core dispute. Further, the bankruptcy judge concludes that the core dispute, a matter within the bankruptcy court's unquestioned jurisdiction, subsumes the non-core dispute, a matter otherwise within the Article III jurisdiction of the district court (or within state court jurisdiction). Finally, the bankruptcy judge concludes that HCC's including in the answer an affirmative defense of "set-off" (that a pleader must plead or waive) is the effective equivalent of HCC's affirmatively asserting a counterclaim, which, as a claim against the debtor's estate, triggers core jurisdiction over the entire proceeding, core and non-core. Although presenting a line of arguably plausible reasoning, the bankruptcy judge's supporting authority is neither binding nor even especially persuasive and the proposed result accomplishes a novel and comprehensive expansion of core jurisdiction, notwithstanding important but competing considerations (including Article III jurisdiction and comity toward a state court).

At the time of his authoring the order in question, the bankruptcy judge did not enjoy the benefit of *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), the most recent and authoritative pronouncement on the intersection of Article III judicial power and the core and the non-core bankruptcy jurisdiction. In *Stern,* before the deceased's death, the deceased's wife, Vickie, sued the deceased's son, Pierce, in Texas state court and alleged that Pierce induced the deceased to execute a living trust that included Pierce but that excluded Vickie and that tortiously interfered with Vickie's expectation of a testamentary gift of half of the deceased's (immense) wealth. Otherwise without money after her husband's death, Vickie filed in California for bankruptcy. In Vickie's bankruptcy Pierce demanded a declaration that his claim against Vickie for defamation was not dischargeable in the California bankruptcy. Pierce later filed in Vickie's bankruptcy a proof of claim demanding damages on the defamation claim. Vickie counterclaimed in bankruptcy court and again asserted the tortious interference claim. In sum, Vickie was a plaintiff in state court in Texas, Pierce was a claimant in bankruptcy court in California, and Vickie was a counterclaimant in bankruptcy court in California. Vickie's actions against Pierce in state court in Texas and in bankruptcy court in California each featured a state, common law claim for tortious interference. Pierce pursued a state law claim of defamation.

Each court bulled ahead. In late 1999, the bankruptcy court granted Vickie a summary judgment against Pierce on his defamation claim, and in September, 2000, the bankruptcy court granted Vickie $425 million in compensatory damages and $25 million in punitive damages on her counterclaim for tortious interference. In post-judgment motions Pierce unsuccessfully challenged the bankruptcy court's jurisdiction to enter a final judgment on Vickie's counterclaim, which Pierce asserted was a

non-core proceeding. On review, the district court disagreed with the bankruptcy court, classified Vickie's counterclaim as non-core, and resolved to entertain the bankruptcy court's "final judgment" as proposed findings of fact and conclusions of law.

In an almost predictable turn of events and before the California district court could resolve the pending proposed findings and conclusions, the Texas state court conducted a jury trial and entered a final judgment for Pierce and against Vickie on her tortious interference claim. Ignoring the Texas judgment and furthering the confusion, the district court in California entered judgment for Vickie and against Pierce on her tortious interference claim but awarded "only" about $44.3 million in compensatory damages (the district court's "independent review" reduced the compensatory damages by about 90% from the earlier $425 million) and another $44.3 million in punitive damages (the "independent review" nearly doubled the earlier punitive damages of $25). The consequent federal appellate trail led from the district court first to the Ninth Circuit, next to the Supreme Court, then back again to the Ninth Circuit, and then back again to the Supreme Court, which finally issued *Stern,* which concludes:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

After noting that "[t]he 'experts' in the federal system at resolving common law counterclaims such as Vickie's are the Article III courts, and it is with those courts that her claim must stay," the Supreme Court further notes that "the most prototype exercise of judicial power" is "the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon an agency regulatory regime," the latter an allusion to the well-established "public rights" exception. (Supreme Court's emphasis) *Stern* includes a plain and unmistakable admonition on the plenary nature of the Article III judicial power:

> ... Congress may not by-pass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.... "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Art. III courts."

*Stern* echoes *Thomas v. Union Carbide Agr. Products Co.,* 473 U.S. 568, 584, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), which states without ambiguity that Article III forbids a bankruptcy court's asserting core jurisdiction over a typical contract dispute:

> Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.

Because the distinction between a core proceeding and a non-core proceeding fundamentally affects daily life in the federal courts, especially helpful is the Supreme

Court's succinct reminder in *Stern* of the meaning of the accumulated precedent:

> Pierce argues that we should treat core matters that arise neither under Title 11 nor in a Title 11 case as proceedings "related to" a Title 11 case. Brief for Respondent 60 (internal quotation marks omitted). We think that a contradiction in terms. It does not make sense to describe a "core" bankruptcy proceeding as merely "related to" the bankruptcy case; oxymoron is not a typical feature of congressional drafting. *See Northern Pipeline* [*Const. Co. v. Marathon Pipe Line Co.* ], 458 U.S. [50] at 71, 102 S.Ct. 2858 [73 L.Ed.2d 598 (1982) ] (plurality opinion) (distinguishing "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, ... from the adjudication of state-created private rights"); Collier on Bankruptcy ¶ 3.02[2], p. 3–26, n.5 (16th ed. 2010) ("The terms 'non-core' and 'related' are synonymous"); *see also id.,* at 3–26 ("The phraseology of section 157 leads to the conclusion that there is no such thing as a matter that is 'related to' a case under title 11. Core proceedings are, at most, those that arise in title 11 cases or arise under title 11" (footnote omitted)). And, as already discussed, the statute simply does not provide for a proceeding that is simultaneously core and yet only related to the bankruptcy case. *See* § 157(c)(1) (providing only for "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11").

HCC's affirmative defense can arise outside of a bankruptcy; even if construed as a counterclaim, the affirmative defense neither evidences an implied consent to the bankruptcy court's jurisdiction nor "invoke[s] the peculiar powers of the bankruptcy court." *In re Toledo,* 170 F.3d 1340, 1349–50 (11th Cir.1999) (quoting *In re Wood,* 825 F.2d 90, 97–98 (5th Cir. 1987)); *see In re Castlerock Properties,* 781 F.2d 159, 162–163 (9th Cir.1986).

A due respect for the boundary of Article III demands caution. However, the bankruptcy judge advances the notion that a non-core claim—by simple entanglement with a core claim—transmogrifies into a core claim on which a bankruptcy judge can enter a final judgment. First, the prospect of a non-core claim for which a separate "claim-by-claim" determination is not "possible" is unpersuasive. Second, the prospect that, if a separation of core and non-core jurisdiction is not "possible," the non-core jurisdiction must inevitably yield to the core jurisdiction is even more highly unpersuasive, as demonstrated in the pertinent Supreme Court precedent. Third, the bankruptcy judge proposes (1) "construing" an affirmative defense as a counterclaim and (2) determining that perforce the construed counterclaim "a defendant submits to the jurisdiction of the bankruptcy court ... and creat[es] core jurisdiction over the whole of the dispute, including otherwise non-core matters." This agile expedient (even if otherwise permissible) seems wholly insufficient to impinge the judicial power solemnly established in Article III. All in all, for these and other reasons, the bankruptcy judge's energetic and studious delineation of the notion of "inextricably intertwined" core and non-core claims seems unsustainable, especially after *Stern,* and the many cases that adumbrate *Stern.*

## CONCLUSION

HCC's Point I on appeal, construed as an objection, is **SUSTAINED.** HCC's Point II and Point III on appeal, each construed as an objection, are **OVERRULED.** Therefore, construed as a report and recommendation, the August 28, 2009, bankruptcy court order is

**ADOPTED,** except for sections I(A), I(B), and I(C) of the conclusions of law, which are **DECLINED.** The bankruptcy court's April 19, 2010, judgment is **VACATED.**

The district court retains jurisdiction pending entry of a final judgment. EME is directed by **May 4, 2012,** to submit a paper of five or fewer pages that (1) calculates the sum certain of a final judgment as of May 4, 2012, and includes the accumulation of pre-judgment interest since April 19, 2010, and (2) provides a calculation of the daily increment of principal plus interest that accrues until the entry of the final judgment. EME must display the reasoning and the calculation underlying the proposed judgment. By **May 18, 2012,** in a paper of five or fewer pages HCC may object to EME's proposed calculation of the judgment.

ORDERED.